# Lancaster Loose Leaf Tobacco Company v. Robinson.

(Decided May 22, 1923.)

## Appeal from Daviess Circuit Court.

1. Corporations—Officer Cannot Make Secret Profits from Position. —An officer of a corporation in his dealings with it or in his dealings with others on behalf of the corporation is held to the strictest good faith, and cannot place himself where his personal interests are antagonistic to those of the corporation, nor make secret or unconscionable profits for himself because of his position as an officer.

2. Corporations—President Need Not Account for Profits from Business Not Competing with Corporation.—Where a tobacco warehouse company had never engaged in the business of buying tobacco from farmers, though it had occasionally bought tobacco at sales conducted on its floors for special reasons, its president need not account to the corporation for profits made by him on tobacco purchased from farmers on his own account and delivered at the corporation's warehouse, so that the corporation

received commissions on the sales thereof, since such transactions by him were not in competition with the corporation's business.

3. Corporations—Misrepresentations by President that he was Acting for Another Held Not to Entitle Company to His Profits.—Misrepresentations by the president of a corporation to the other officers that the tobacco which he was purchasing from farmers in his own name was being purchased on behalf of another were immaterial where he did not, in making such purchases, compete with the business of the corporation, and do not entitle the corporation to the profits made by him from tobacco so purchased.

CLEMENTS & CLEMENTS and BEN D. RINGO for appellant.

E. B. ANDERSON and W. FOSTER HAYES for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—
Affirming.

In 1913 appellant, Lancaster Loose Leaf Tobacco Company, was incorporated by W. D. Lancaster, George Bentley and G. W. Robinson, who were the only three original stockholders. In 1914 Lancaster sold his stock to J. F. Vickers, and thereafter Robinson was elected president, Vickers vice-president and Bentley secretary and treasurer.

The purposes of the organization of the corporation, as stated in the articles, are as follows:

"To maintain and conduct a warehouse for the receipt, storage and sale, on commission or otherwise, of leaf tobacco, other kinds of farm produce, or the articles manufactured therefrom; to issue warehouse receipts therefor, negotiable or otherwise, to persons storing such tobacco, other farm produce, or the articles manufactured therefrom; to make advances or loans to farmers, producers and dealers in tobacco, other farm produce, or the articles manufactured therefrom, and store, sell or market the same; to acquire by deed or otherwise, warehouses, lands, materials and supplies convenient to use in connection with and in carrying on the business as mentioned above; to cure, redry, prize and pack leaf tobacco, other farm produce, or the articles manufactured therefrom."

The three gentlemen named as officers above were the only three stockholders and continued to operate the business in their several capacities until the summer of

1919, when one Roberts bought a one-fourth of the capital stock of the company.

Each officer had certain duties assigned to him in the conduct of the business, and as they were equal stockholders, at the end of the business year all the profits were equally divided and paid to the several officers as salaries.

It appears that a large proportion of the tobacco handled on the Owensboro market is of a different kind entirely from burley tobacco, there being comparatively little of that kind raised in that locality, but in a certain section of Daviess county and a small part of an adjoining county there was raised some burley tobacco. In the season of 1918-1919 there was a purchaser of burley tobacco by the name of Vaughn on the Owensboro market, and for reasons that are not made clear in that year he procured others to go out into the country among the farmers and buy up for him, but in their own names, this burley tobacco, and have it delivered at the warehouse of, and paid for by appellant company. This arrangement in 1918-1919 seems to have been understood by all of the parties interested in the appellant company. Its interest primarily in the burley tobacco grew out of having the same brought to and sold upon the floors of their warehouse to the end that the company might receive the commissions. Although this arrangement of Vaughn's during that year was intended to be kept secret, it leaked out pretty generally.

There was no complaint by appellant or any of its officers or stockholders about this arrangement with Vaughn in 1918-1919, but in the late summer or fall of 1919 it is alleged that Robinson, who was then still the president of appellant company, went to his associates who were the other officers, and told them in substance that Vaughn again wanted to buy the burley tobacco raised in that section, but for reasons of his own desired that his name be not used in any way, and that Vaughn had requested him, Robinson, for the company to furnish the money and buy this tobacco in his, Robinson's, name, that in this way appellant company would have the benefit of the sales over its warehouse floor 'and get the commissions. This arrangement was agreed to by the other officers of the company, as they believed the statement of Robinson that his purchases of burley tobacco were entirely for Vaughn and that he personally had no interest whatsoever in such purchases, and desired only that the

business should be transacted through the company's warehouse.

Accordingly, under this arrangement Robinson went into the country among the farmers who raised burley tobacco and in his own name bought a large quantity. The contracts with the farmers were made in Robinson's own name, and each of the contracts required delivery to appellant's warehouse at Owensboro.

The delivery of this tobacco by the farmers began shortly before the first of December, 1919, and was practically all delivered to appellant and paid for by it, and the books of the company show the whole of the transaction, the accounts being kept in the name of G. W. Robinson, Vaughn's name not appearing. On this purchase of burley tobacco a profit of something like twenty-four thousand dollars was realized, and it afterwards developed that the purchase was in fact made by Robinson not only in his own name but for his own benefit.

This is an equitable action by the corporation of which Robinson was at the time of this purchase president, seeking to recover from him the profits thus realized by him upon the purchase of burley tobacco, upon the theory that as an officer of the corporation any secret profits thus made by him in a business transaction of a nature similar to that in which the corporation of which he is an officer is engaged, should not be retained by him, but inure to the benefit of the corporation.

The answer, in addition to a denial of the fraudulent misrepresentations alleged to have been made by defendant to the other officers of the company, and making the affirmative defense that they understood while he was buying the tobacco it was in fact on his own account and for his own benefit, relied upon several other defenses in bar of plaintiff's right to recover.

The only defense which we think it necessary to discuss is that wherein defendant relies upon his averment that appellant company was organized for the purpose of owning and operating a loose leaf tobacco warehouse, and selling and having sold by auctioneers over its floor tobacco brought there for that purpose by producers and other owners, and of selling the same for such owners and persons and charging and receiving commissions therefor, and that that was the only business in which the plaintiff company was at the time of the transaction involved engaged, or in which it had ever been engaged,

and that plaintiff during the season of 1919-1920 did not buy for itself any burley tobacco, and was not engaged in the purchase of burley tobacco and that plaintiff did not at any time send its officers or agents out in the country to buy or try to buy any tobacco of any kind or description from the farmers or growers of the same.

These allegations are fully sustained by the evidence, even of the other officers of the company. They admit appellant company never sent during its existence any of its officers or agents out in the country to buy tobacco from the producers, and never in fact bought any tobacco of any kind or description except a few crops of Pryor tobacco which it incidentally purchased at certain times on its floors.

So then the question is, may the officer of a tobacco warehouse company which is not engaged in the purchase of tobacco, for himself and on his own account go out and buy tobacco for speculative purposes without turning over whatever profits he might make thereon to the corporation of which he is an officer.

That an officer of a corporation in his dealings with it, or in his dealings with others on behalf of the corporation, will be held to the strictest good faith, and that he will never be permitted to place himself where his personal interests are antagonistic to those of the corporation, nor to make secret or unconscionable profits for himself because of his position as an officer of the corporation, are such well recognized and fundamental principles that we need not discuss them. In fact these general principles are agreed to by counsel on both sides.

But the question in this case is whether in applying these general principles an officer of a corporation, which corporation is not at the time and never has been engaged in a particular line of business, is to be denied the right to go out and engage in that particular thing in his own name and for his benefit, when in doing so he is neither interfering with the business which the corporation is doing, nor placing himself in such attitude that his personal interests are made to conflict with his duty as an officer of the corporation. Here Robinson knew, and each of the other officers and stockholders of appellant company knew, that in fact in its seven or eight years of corporate existence it had never done that thing, and had never speculated in tobacco to any extent, but

had only occasionally bought a few crops of tobacco when offered on its floors for business reasons of its own.

To deny to an officer of a corporation the right to do business for himself and for his own benefit in a line which the corporation is not engaged in, and had never been, would be the carrying of the principle contended for to an unauthorized extent, and would be in effect to say to officers of corporations that they should not on their own account make profits in any line or in any endeavor, which the corporation might not appropriate thereafter.

The fundamental reason of this rule is that one acting in a fiducial relation to another will not be permitted to place himself in such position as to make his individual interests antagonistic to that of the corporation which he represents in the same line of business, and we find here that appellee was doing no such thing. He knew and all the officers and stockholders knew the company had never engaged in and did not propose to engage in the purchase of burley tobacco, and when therefore he went out on his own account and made such purchase, there was no antagonism whatever between his interests as an individual and his duty as an officer of the corporation. The only interest the corporation had was in receiving the commissions for this tobacco when sold over the floors of its warehouse, and this interest was fully protected, for not only did appellee in his contracts with the farmers require them to deliver it to appellant's warehouse, but in fact it was so delivered and sold on its floors.

Of course it appears the initial payments for the crops of tobacco so bought by Robinson were made by the warehouse company when they were delivered, but it appears they were each sold thereafter in a day or two at a profit, and the money paid by the purchaser to the company. It likewise appears that the company desired to and did retain and use in its business the profits thus realized on this burley tobacco, and for its own convenience had no settlement with Robinson for the profits coming to him until a large part of the tobacco was sold, when Robinson accounted for all the money paid out by the company for his tobacco. They were closely connected in business and doubtless this plan was followed as a matter of convenience for them all.

A question somewhat similar to this was under consideration in the case of Jasper v. Appalachain Gas Company, 152 Ky. 68. In that case Allen was the president of the Appalachain Gas Company and had been so elected in December, 1903. Between that date and September, 1905, the Appalachain Gas Company had become wholly insolvent. It had been demonstrated during that time that certain property owned by the Appalachain Gas Company was of little or no value, and that company, while still in existence, was not only insolvent but had ceased to be a going concern; then in September, 1905, while Allen was still the president of that company, the city of Lexington offered for sale a gas franchise and Allen, for himself and others, became the purchaser of the same. Thereafter Allen and his associates sold and transferred the gas franchise purchased by him in September, 1905, to the Central Kentucky Natural Gas Company, another corporation organized for the same general purposes as was the Appalachain Gas Company. Thereafter the Appalachain Gas Company instituted an action to compel Allen and his associates to surrender the consideration they had received from the Central Kentucky Natural Gas Company for the Lexington franchise.

This court, after recognizing the doctrine that officers of corporations will not be permitted to assume double relations but be compelled to account for any secret profits which they may have made, denied the right of the Appalachain Gas Company to a recovery and said:

"Here the corporation, while still maintaining its corporate existence, had clearly failed in its purposes; not only so, but it was wholly insolvent and, for some time prior to the purchase of the franchise in question, had ceased even in an attempt to actively prosecute its business. We see no good reason why the officers and directors of such a corporation should be denied the right to make advantageous trades for themselves, when, in so doing, the interests of the insolvent, practically defunct, corporation which they represent, are in nowise prejudiced thereby. It was utterly immaterial to the Appalachain Gas Company who bought the franchise that was sold by the city of Lexington in 1905. . . . A critical analysis of the evidence fails to disclose wherein the appellees were recreant, in the slightest degree, in the discharge of any duty owing by them to the Appalachain Gas Company, either as individual stockholders or officers of said company. They made no profit at the expense of

the Appalachain Gas Company. It did not own, nor were they obligated to buy for it, the franchise, when offered for sale by the city of Lexington in 1905.''

The general principle there decided appears to be that an officer of an insolvent corporation who on his own account and for his own purposes engages in a venture similar to that·which the corporation might engage in, and makes a profit out of it, is not liable to the corporation for the profit made by him where the corporation is insolvent and incapable of exercising the franchise purchased by him, even if he had done so for its benefit.

A slight variation of that principle applies to the facts of this case. Here the president of a corporation on his own account engaged in a venture in a line of business never engaged in by the corporation, and makes a profit. If the corporation had been insolvent and unable to carry out the venture, under the rule in the Jasper case, appellant would not be liable to it. Here the case is stronger, for the corporation had never engaged in the particular line of business, and its course of business shows that its policy had been not to· engage in it. What can be the difference between a corporation which is insolvent and therefore unable to carry out a venture undertaken by one of its officers, and a corporation capable of carrying out the venture, but because of its business policy unwilling to undertake it, as applied to this general rule of equity?

The authorities referred to in the Jasper case seem to uphold the ruling there announced, and that case is further reported in Ann. Cas. 1915B, 192, and there is appended to it a note showing other cases to the same effect. Also see Fletcher, Cyclopedia of Corporations, volume 4, section 2305; Dishman v. Umberhour, 194 Ky. 772.

The·fact that appellee, as appears from a preponderance of the evidence, did deceive his business associates with reference to the purchase of this tobacco cannot change the principle of law involved. Whether he deceived them or not cannot alter his right to engage in a venture while he was president of the corporation when the latter was not and had never been engaged in the particular line of business.

It seems to be conceded by the other officers of the corporation that they knew, or believed, Robinson was buying the tobacco for Vaughn, and they concede that the only interest they had, or thought they had, in it was the commissions the company might realize through the sale

over its floors. We confess an inability to understand what difference it made to the company whether Robinson was buying the tobacco for himself or for Vaughn, as long as it received the commissions, and as long as it was not engaged in the purchase of burley tobacco and there was no interference or competition with its business.

Judgment affirmed.