CHARLES G. GUTH and THE GRACE COMPANY, INC., OF DELAWARE, a corporation of the State of Delaware,

Defendants Below, Appellants,

*vs.*

LOFT, INCORPORATED,

Complainant Below, Appellee,

and

Pepsi-Cola Company, a corporation of the State of Delaware,

Defendant Below, Appellee.

*Supreme Court, On Appeal, April 11, 1939.*

LAYTON, C. J., RICHARDS, RODNEY, SPEAKMAN, and TERRY, J J., sitting.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *George Wharton Pepper,* of Philadelphia, Pa. (John Sailer, James A. Montgomery, Jr., and Pepper, Bodine, Stokes & Schoch, all of Philadelphia, Pa., of counsel) for appellants.

*Clarence A. Southerland,* of the firm of Ward & Gray, (David L. Podell, Hays, Podell & Shulman, and Levien, Singer & Neuburger, all of New York City of counsel), for appellee.

LAYTON, Chief Justice, delivering the opinion of the Court:

In the court below the appellants took the position that, on the facts, the complainant was entitled to no equitable relief whatever. In this court, they seek only a modification of the Chancellor's decree, not a reversal of it. They now contend that the question is one of equitable adjustment based upon the extent and value of the respective contributions of the appellants and the appellee. This change of

position is brought about, as it is said, because of certain basic fact findings of the Chancellor which are admittedly unassailable in this court. The appellants accept the findings of fact; but they contend that the Chancellor's inferences from them were unwarrantable in material instances, and far more favorable to the complainant than they would have been had not he felt justified in penalizing Guth for what seemed to him serious departures from a strict standard of official conduct. They say that this attitude of mind of the Chancellor was brought about by attacking Guth's official conduct in such manner as to create an impression of ruthlessness, thereby causing the Chancellor to be less critical of equitable theory, and more inclined to do what amounted to an infliction of a penalty.

As stated by the appellants, there were certain questions before the Chancellor for determination:

(1)   Was Guth at the time the Pepsi-Cola opportunity came to him obligated, in view of his official connection with Loft, to take the opportunity for Loft rather than for himself?   On this point the appellants contend no finding was made.

(2)   Was Guth, nevertheless, estopped from denying that the opportunity belonged to Loft; and was he rightfully penalized to the extent of his whole interest therein, merely because resources borrowed from Loft had contributed in some measure to its development; and did Loft's contributions create the whole value behind the interests of Guth and Grace in Pepsi, thereby constituting Loft the equitable owner of those interests?   These questions were answered in the affirmative; and because of the answers, the Chancellor, it is said, did not answer the last question before him, that is, upon what theory and to what extent should Loft share in the proceeds of the Pepsi-Cola enterprise?

The appellants contend, at length and earnestly, that the Chancellor made no finding of fact with respect to corporate opportunity. They admit that if the Chancellor had found, or if this court should find, that the Pepsi-Cola opportunity was one which Guth, as president and dominant director of Loft, was bound to embrace for it, such finding would create, as it is said, an obstacle to the appellants' right to a reappraisement of the Loft contributions to the Pepsi-Cola enterprise; and as the oral argument is remembered, it was stated in more direct and explicit terms, that if the Chancellor had so found, or if this court should find, in favor of Loft upon the issue, the case would be at an end.

The appellants offer a comparison of the preliminary draft of a decree, submitted by the complainant as "Finding A," with the final draft of that finding. Briefly, the substantial difference is, that in the preliminary draft it was stated that the opportunity to acquire the formula, goodwill and business incident to the manufacture and sale of Pepsi-Cola, belonged to the complaint; whereas, in the decree as signed, it was stated that Guth was estopped to deny that he had received the opportunity on behalf of the complainant. The appellants say that strenuous objection was made to the draft submitted by the appellee on the ground that nowhere in the Chancellor's opinion did it appear that he had found, as a fact, that the opportunity belonged to Loft, and after full consideration, the Chancellor acquiesced, and the modification was made. The appellee contends that the Chancellor did find that the Pepsi-Cola opportunity belonged to it, and that the modification was made for other reasons.

In these circumstances of contention, certain questions suggest themselves for consideration, and some of them for answer: Did the Chancellor make an explicit finding that the Pepsi-Cola opportunity belonged in equity to Loft, and if so, was such finding justifiable in fact and in law? If the

Chancellor made no such explicit finding, should he have done so, or should this court make such finding? Assuming that the Chancellor made no explicit finding and that this court should not feel justified in making such finding, was, and is, the doctrine of estoppel properly invocable in favor of the complainant?

The complainant is not, of course, precluded from making the argument that, upon the law and the facts, the Pepsi-Cola opportunity belonged to it; nor is this court prohibited from so finding.

It is necessary briefly to notice what the Chancellor said with respect to the question of corporate opportunity. As a preliminary to the discussion of the question, the Chancellor stated generally the principles governing officers and directors of a corporation with respect to their fiduciary relation to the corporation and its stockholders, and their liability to account to the corporation for profits and advantages resulting from unlawful acts and breaches of trust done and committed in the promotion of their own interests. He then proceeded to say that Guth, being not only a director of Loft but its president as well, and dominant in the management of its affairs, the principles and rules governing trustees in their relations with their correlates applied to him with peculiar and exceptional force. He particularly noticed a proposition of law stated by the defendants, that when a business opportunity comes to an officer or director in his individual capacity rather than in his official capacity, and is one which, because of its nature, is not essential to the corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own. As stated, he found the proposition acceptable in the main; but he observed that the cases cited by the defendant recognized as true also the converse of the proposition, and that in all of them the fundamental fact of good faith was found in favor of the officer

or director charged with the dereliction. He then proceeded to say [*ante p.* 170, 2 *A.* 2*d* 240]:

"Now the evidence in the case *sub judice* does not warrant the view that any one of these features may be affirmed as existing here. The brief review of some of its salient features which I have hereinbefore made, shows the opposite of every one of them to have been the fact. That Loft had the means to finance and establish the business is clearly demonstrated. In every aspect of essential fact it did so. That Guth did not use his own funds and risk his own resources in acquiring and developing the Pepsi business is equally demonstrated. He was in fact unable to do so. I dismiss from consideration his claim of a parol contract of guaranty with Loft by which he engaged to save it harmless from any loss it might suffer from its advances. I conclude that no such guaranty was given. Even if it was, it was worthless. That the business of producing Pepsi-Cola syrup was in the line of Loft's business and of practical and not theoretical interest to it, is shown by the fact that Loft was engaged in manufacturing fountain syrups of numerous kinds to supply its own extensive needs. Indeed the outstanding justification which Guth offers for his utilization of Loft's resources on the scale he did, was Loft's need for a constant and reliable supply of Pepsi-Cola syrup. The former directors now allied with Guth, a minority of the former board, offer a like justification for their alleged approval of Guth's acts in plunging Loft deep into the Pepsi venture. It does not become either Guth or the minority group of directors now associated with him to claim that Pepsi was an enterprise which was foreign to Loft's purposes and alien to its business interests. The very claim, if accepted, denounces as a shocking breach of their duty as directors their act of agreeing, as they now say they did, to Guth's free use of Loft's resources of all kinds to an unlimited extent to promote and develop the enterprise.

"I am of the opinion that under such circumstances as are disclosed in this case, Guth is estopped by what he subsequently caused Loft to do, to deny that when he embraced the Megargel offer he did so in behalf of Loft. The offer cannot be viewed in any light other than an expectancy that was Loft's. Guth is estopped to contend to the contrary. The case of *Bailey v. Jacobs*, 325 *Pa.* 187, 189 *A.* 320, cited at an earlier point in this opinion, is a pertinent and persuasive authority in support of that view."

Manifestly, the Chancellor found to exist facts and circumstances from which the conclusion could be reached that the Pepsi-Cola opportunity belonged in equity to Loft.

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.

If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. Given the relation between the parties, a certain result follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty. *Lofland, et al.,*

*v. Cahall,* 13 *Del. Ch.* 384, 118 *A.* 1; *Bodell v. General Gas & Elec. Corp.,* 15 *Del. Ch.* 119, 132 *A.* 442, *affirmed* 15 *Del. Ch.* 420, 140 *A.* 264; *Trice, et al., v. Comstock,* (8 *Cir.*) 121 *F.* 620, 61 *L.R.A.* 176; *Jasper v. Appalachian Gas Co.,* 152 *Ky.* 68, 153 *S.W.* 50, *Ann. Cas.* 1915B, 192; *Meinhard v. Salmon,* 249 *N. Y.* 458, 164 *N.E.* 545, 62 *A.L.R.* 1; *Wendt v. Fischer,* 243 *N.Y.* 439, 154 *N.E.* 303; *Bailey v. Jacobs,* 325 *Pa.* 187, 189 *A.* 320; *Cook v. Deeks,* [1916] *L.R.* 1 *A.C.* 554.

The rule, referred to briefly as the rule of corporate opportunity, is merely one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents.

It is true that when a business opportunity comes to a corporate officer or director in his individual capacity rather than in his official capacity, and the opportunity is one which, because of the nature of the enterprise, is not essential to his corporation, and is one in which it has no interest or expectancy, the officer or director is entitled to treat the opportunity as his own, and the corporation has no interest in it, if, of course the officer or director has not wrongfully embarked the corporation's resources therein. *Colorado & Utah Coal Co. v. Harris, et al.,* 97 *Colo.* 309, 49 *P.* 2d 429; *Lagarde v. Anniston Lime & Stone Co.,* 126 *Ala.* 496, 28 *So.* 199; *Pioneer Oil & Gas Co. v. Anderson,* 168 *Miss.* 334, 151 *So.* 161; *Sandy River R. Co. v. Stubbs,* 77 *Me.* 594, 2 *A.* 9; *Lancaster Loose Leaf Tobacco Co. v. Robinson,* 199 *Ky.* 313, 250 *S. W.* 997. But, in all of these cases, except, perhaps, in one, there was no infidelity on the part of the corporate officer sought to be charged. In the first case, it was found that the corporation had no practical use for the property acquired by Harris. In the *Pioneer Oil & Gas Co.* case, Anderson used no funds or assets of the corporation, did not know that the corporation was negotiating for the oil lands and, further, the corporation could not, in any

event have acquired them, because their proprietors objected to the corporation's having an interest in them, and because the corporation was in no financial position to pay for them. In the *Stubbs* case, the railroad company, desiring to purchase from Porter such part of his land as was necessary for its right of way, station, water-tank, and woodshed, declined to accede to his price. Stubbs, a director, made every effort to buy the necessary land for the company and failed. He then bought the entire tract, and offered to sell to the company what it needed. The company repudiated expressly all participation in the purchase. Later the company located its tracks and buildings on a part of the land, but could not agree with Stubbs as to damages or terms of the conveyance. Three and one-half years thereafter, Stubbs was informed for the first time that the company claimed that he held the land in trust for it. In the *Lancaster Loose Leaf Tobacco Co.* case, the company had never engaged in the particular line of business, and its established policy had been not to engage in it. The only interest which the company had in the burley tobacco bought by Robinson was its commissions in selling it on its floors, and these commissions it received. In the *Lagarde* case, it was said that the proprietorship of the property acquired by the Legardes may have been important to the corporation, but was not shown to have been necessary to the continuance of its business, or that its purchase by the Legardes had in any way impaired the value of the corporation's property. This decision is, perhaps, the strongest cited on behalf of the appellants. With deference to the court that rendered it, a different view of the correctness of the conclusion reached may be entertained.

On the other hand, it is equally true that, if there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which

the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired. *DuPont v. DuPont, et al.,* (*D.C.*) 242 *F.* 98, reversed on facts, (3 *Cir.*) 256 *F.* 129; *Beatty v. Guggenheim Exploration Co.,* 225 *N. Y.* 380, 122 *N.E.* 378; *Irving Trust Co. v. Deutsch,* (2 *Cir.*) 73 *F.* 2d 121; *certiorari* denied, *Biddle v. Irving Trust Co.,* 294 *U. S.* 708, 55 *S. Ct.* 405, 79 *L. Ed.* 1243; *Bailey v. Jacobs, supra; Beaudette, et al., v. Graham, et al.,* 267 *Mass.* 7, 165 *N. E.* 671; *McKey v. Swenson,* 232 *Mich.* 505, 205 *N. W.* 583.

But, there is little profit in a discussion of the particular cases cited. In none of them are the facts and circumstances comparable to those of the case under consideration. The question is not one to be decided on narrow or technical grounds, but upon broad considerations of corporate duty and loyalty.

As stated in 3 *Fletcher Cyclopedia, Corporations,* § 862, an authority seemingly relied on by the appellants,

"There is a vast field for individual activity outside the duty of a director, yet well within the general scope of the corporation's business. The test seems to be whether there was a specific duty, on the part of the officer sought to be held liable, to act or contract in regard to the particular matter as the representative of the corporation—all of which is largely a question of fact."

Duty and loyalty are inseparably connected. Duty is that which is required by one's station or occupation; is that which one is bound by legal or moral obligation to do or refrain from doing; and it is with this conception of duty

as the underlying basis of the principle applicable to the situation disclosed, that the conduct and acts of Guth with respect to his acquisition of the Pepsi-Cola enterprise will be scrutinized. Guth was not merely a director and the president of Loft. He was its master. It is admitted that Guth manifested some of the qualities of a dictator. The directors were selected by him. Some of them held salaried positions in the company. All of them held their positions at his favor. Whether they were supine merely, or for sufficient reasons entirely subservient to Guth, it is not profitable to inquire. It is sufficient to say that they either wilfully or negligently allowed Guth absolute freedom of action in the management of Loft's activities, and theirs is an unenviable position whether testifying for or against the appellants.

Prior to May, 1931, Guth became convinced that Loft was being unfairly discriminated against by the Coca-Cola Company of whose syrup it was a large purchaser, in that Loft had been refused a jobber's discount on the syrup, although others, whose purchases were of far less importance, had been given such discount. He determined to replace Coca-Cola as a beverage at the Loft stores with some other cola drink, if that could be accomplished. So, on May 19, 1931, he suggested an inquiry with respect to desirability of discontinuing the use of Coca-Cola, and replacing it with Pepsi-Cola at a greatly reduced price. Pepsi-Cola was the syrup produced by National Pepsi-Cola Company. As a beverage it had been on the market for over twenty-five years, and while it was not known to consumers in the area of the Loft stores, its formula and trademark were well established. Guth's purpose was to deliver Loft from the thraldom of the Coca-Cola Company, which practically dominated the field of cola beverages, and, at the same time to gain for Loft a greater margin of profit on its sales of cola beverages. Certainly, the choice of an acceptable substitute for Coca-Cola was not a wide one, and, doubtless,

his experience in the field of bottled beverages convinced him that it was necessary for him to obtain a cola syrup whose formula and trademark were secure against attack. Although the difficulties and dangers were great, he concluded to make the change. Almost simultaneously, National Pepsi-Cola Company, in which Megargel was predominant and whom Guth knew, went into bankruptcy; and Guth was informed that the long established Pepsi-Cola formula and trademark could be had at a small price. Guth, of course, was Loft; and Loft's determination to replace Coca-Cola with some other cola beverage in its many stores was practically co-incidental with the opportunity to acquire the Pepsi-Cola formula and trademark. This was the condition of affairs when Megargel approached Guth. Guth contended that his negotiation with Megargel in 1931 was but a continuation of a negotiation begun in 1928, when he had no connection with Loft; but the Chancellor found to the contrary, and his finding is accepted.

It is urged by the appellants that Megargel offered the Pepsi-Cola opportunity to Guth personally, and not to him as president of Loft. The Chancellor said that there was no way of knowing the fact, as Megargel was dead, and the benefit of his testimony could not be had; but that it was not important, for the matter of consequence was how Guth received the proposition.

It was incumbent upon Guth to show that his every act in dealing with the opportunity presented was in the exercise of the utmost good faith to Loft; and the burden was cast upon him satisfactorily to prove that the offer was made to him individually. Reasonable inferences, drawn from acknowledged facts and circumstances, are powerful factors in arriving at the truth of a disputed matter, and such inferences are not to be ignored in considering the acts and conduct of Megargel. He had been for years engaged in the manufacture and sale of a cola syrup in com-

petition with Coca-Cola. He knew of the difficulties of competition with such a powerful opponent in general, and in particular in the securing of a necessary foothold in a new territory where Coca-Cola was supreme. He could not hope to establish the popularity and use of his syrup in a strange field, and in competition with the assured position of Coca-Cola, by the usual advertising means, for he, himself, had no money or resources, and it is entirely unbelievable that he expected Guth to have command of the vast amount of money necessary to popularize Pepsi-Cola by the ordinary methods. He knew of the difficulty, not to say impossibility, of inducing proprietors of soft drink establishments to use a cola drink utterly unknown to their patrons. It would seem clear, from any reasonable point of view, that Megargel sought to interest someone who controlled an existing opportunity to popularize his product by an actual presentation of it to the consuming public. Such person was Guth, the president of Loft. It is entirely reasonable to infer that Megargel approached Guth as president of Loft, operating, as it did, many soft drink fountains in a most necessary and desirable territory where Pepsi-Cola was little known, he well knowing that if the drink could be established in New York and circumjacent territory, its success would be assured. Every reasonable inference points to this conclusion. What was finally agreed upon between Megargel and Guth, and what outward appearance their agreement assumed, is of small importance. It was a matter of indifference to Megargel whether his co-adventurer was Guth personally, or Loft, so long as his terms were met and his object attained.

Leaving aside the manner of the offer of the opportunity, certain other matters are to be considered in determining whether the opportunity, in the circumstances, belonged to Loft; and in this we agree that Guth's right to appropriate the Pepsi-Cola opportunity to himself depends upon the circumstances existing at the time it presented it-

self to him without regard to subsequent events, and that due weight should be given to character of the opportunity which Megargel envisioned and brought to Guth's door.

The real issue is whether the opportunity to secure a very substantial stock interest in a corporation to be formed for the purpose of exploiting a cola beverage on a whole-sale scale was so closely associated with the existing business activities of Loft, and so essential thereto, as to bring the transaction within that class of cases where the acquisition of the property would throw the corporate officer purchasing it into competition with his company. This is a factual question to be decided by reasonable inferences from objective facts.

It is asserted that, no matter how diversified the scope of Loft's activities, its primary business was the manufacturing and selling of candy in its own chain of retail stores, and that it never had the idea of turning a subsidiary product into a highly advertised, nation-wide specialty. Therefore it had never initiated any investigation into the possibility of acquiring a stock interest in a corporation to be formed to exploit Pepsi-Cola on the scale envisioned by Megargel, necessitating sales of at least 1,000,000 gallons a year. It is said that the most effective argument against the proposition that Guth was obligated to take the opportunity for Loft is to be found in the complainant's own assertion that Guth was guilty of an improper exercise of business judgment when he replaced Coca-Cola with Pepsi-Cola at the Loft stores. Assuming that the complainant's argument in this respect is incompatible with its contention that the Pepsi-Cola opportunity belonged to Loft, it is no more inconsistent than is the position of the appellants on the question. In the court below, the defendants strove strenuously to show, and to have it believed, that the Pepsi-Cola opportunity was presented to Loft by Guth, with a full disclosure by him that if the company did not embrace

it, he would. This, manifestly, was a recognition of the necessity for his showing complete good faith on his part as a corporate officer of Loft. In this court, the Chancellor having found as a fact that Guth did not offer the opportunity to his corporation, it is asserted that no question of good faith is involved for the reason that the opportunity was of such character that Guth, although Loft's president, was entirely free to embrace it for himself. The issue is not to be enmeshed in the cobwebs of sophistry. It rises far above inconsistencies in argument.

The appellants suggest a doubt whether Loft would have been able to finance the project along the lines contemplated by Megargel, viewing the situation as of 1931. The answer to this suggestion is two-fold. The Chancellor found that Loft's net asset position at that time was amply sufficient to finance the enterprise, and that its plant, equipment, executives, personnel and facilities, supplemented by such expansion for the necessary development of the business as it was well able to provide, were in all respects adequate. The second answer is that Loft's resources were found to be sufficient, for Guth made use of no other to any important extent.

Next it is contended that the Pepsi-Cola opportunity was not in the line of Loft's activities which essentially were of a retail nature. It is pointed out that, in 1931, the retail stores operated by Loft were largely located in the congested areas along the Middle Atlantic Seaboard, that its manufacturing operations were centered in its New York factory, and that it was a definitely localized business, and not operated on a national scale; whereas, the Megargel proposition envisaged annual sales of syrup at least a million gallons, which could be accomplished only by a wholesale distribution. Loft, however, had many wholesale activities. Its wholesale business in 1931 amounted to over $800,000. It was a large company by any standard. It had

an enormous plant. It paid enormous rentals. Guth, himself, said that Loft's success depended upon the fullest utilization of its large plant facilities. Moreover, it was a manufacturer of syrups and, with the exception of cola syrup, it supplied its own extensive needs. The appellants admit that wholesale distribution of bottled beverages can best be accomplished by license agreements with bottlers. Guth, president of Loft, was an able and experienced man in that field. Loft, then, through its own personnel, possessed the technical knowledge, the practical business experience, and the resources necessary for the development of the Pepsi-Cola enterprise.

But, the appellants say that the expression, "in the line" of a business, is a phrase so elastic as to furnish no basis for a useful inference. The phrase is not within the field of precise definition, nor is it one that can be bounded by a set formula. It has a flexible meaning, which is to be applied reasonably and sensibly to the facts and circumstances of the particular case. Where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion, it may be properly said that the opportunity is in the line of the corporation's business.

The manufacture of syrup was the core of the Pepsi-Cola opportunity. The manufacture of syrups was one of Loft's not unimportant activities. It had the necessary resources, facilities, equipment, technical and practical knowledge and experience. The tie was close between the business of Loft and the Pepsi-Cola enterprise. *Beatty v. Guggenheim Exploration Co.,* 225 *N.Y.* 380, 122 *N.E.* 378; *Transvaal Cold Storage Co., Ltd., v. Palmer,* [1904] *T. S.*

*Transvaal L. R.* 4. Conceding that the essential of an opportunity is reasonably within the scope of a corporation's activities, latitude should be allowed for development and expansion. To deny this would be to deny the history of industrial development.

It is urged that Loft had no interest or expectancy in the Pepsi-Cola opportunity. That it had no existing property right therein is manifest; but we cannot agree that it had no concern or expectancy in the opportunity within the protection of remedial equity. Loft had a practical and essential concern with respect to some cola syrup with an established formula and trademark. A cola beverage has come to be a business necessity for soft drink establishments; and it was essential to the success of Loft to serve at its soda fountains an acceptable five cent cola drink in order to attract into its stores the great multitude of people who have formed the habit of drinking cola beverages. When Guth determined to discontinue the sale of Coca-Cola in the Loft stores, it became, by his own act, a matter of urgent necessity for Loft to acquire a constant supply of some satisfactory cola syrup, secure against probable attack, as a replacement; and when the Pepsi-Cola opportunity presented itself, Guth having already considered the availability of the syrup, it became impressed with a Loft interest and expectancy arising out of the circumstances and the urgent and practical need created by him as the directing head of Loft.

As a general proposition it may be said that a corporate officer or director is entirely free to engage in an independent, competitive business, so long as he violates no legal or moral duty with respect to the fiduciary relation that exists between the corporation and himself. The appellants contend that no conflict of interest between Guth and Loft resulted from his acquirement and exploitation of the Pepsi-Cola opportunity. They maintain that the ac-

quisition did not place Guth in competition with Loft any more than a manufacturer can be said to compete with a retail merchant whom the manufacturer supplies with goods to be sold. However true the statement, applied generally, may be, we emphatically dissent from the application of the analogy to the situation of the parties here. There is no unity between the ordinary manufacturer and the retailer of his goods. Generally, the retailer, if he becomes dissatisfied with one supplier of merchandise, can turn to another. He is under no compulsion and no restraint. In the instant case Guth was Loft, and Guth was Pepsi. He absolutely controlled Loft. His authority over Pepsi was supreme. As Pepsi, he created and controlled the supply of Pepsi-Cola syrup, and he determined the price and the terms. What he offered, as Pepsi, he had the power, as Loft, to accept. Upon any consideration of human characteristics and motives, he created a conflict between self-interest and duty. He made himself the judge in his own cause. This was the inevitable result of the dual personality which Guth assumed, and his position was one which, upon the least austere view of corporate duty, he had no right to assume. Moreover, a reasonable probability of injury to Loft resulted from the situation forced upon it. Guth was in the same position to impose his terms upon Loft as had been the Coca-Cola Company. If Loft had been in servitude to that company with respect to its need for a cola syrup, its condition did not change when its supply came to depend upon Pepsi, for, it was found by the Chancellor, against Guth's contention, that he had not given Loft the protection of a contract which secured to it a constant supply of Pepsi-Cola syrup at any definite price or for any definite time.

It is useless to pursue the argument. The facts and circumstances demonstrate that Guth's appropriation of the Pepsi-Cola opportunity to himself placed him in a competitive position with Loft with respect to a commodity es-

sential to it, thereby rendering his personal interests incompatible with the superior interests of his corporation; and this situation was accomplished, not openly and with his own resources, but secretly and with the money and facilities of the corporation which was committed to his protection.

Although the facts and circumstances disclosed by the voluminous record clearly show gross violations of legal and moral duties by Guth in his dealings with Loft, the appellants make bold to say that no duty was cast upon Guth hence he was guilty of no disloyalty. The fiduciary relation demands something more than the morals of the market place. *Meinhard v. Salmon, supra.* Guth's abstractions of Loft's money and materials are complacently referred to as borrowings. Whether his acts are to be deemed properly cognizable in a civil court at all, we need not inquire, but certain it is that borrowing is not descriptive of them. A borrower presumes a lender acting freely. Guth took without limit or stint from a helpless corporation, in violation of a statute enacted for the protection of corporations against such abuses, and without the knowledge or authority of the corporation's board of directors. Cunning and craft supplanted sincerity. Frankness gave way to concealment. He did not offer the Pepsi-Cola opportunity to Loft, but captured it for himself. He invested little or no money of his own in the venture, but commandeered for his own benefit and advantage the money, resources and facilities of his corporation and the services of its officials. He thrust upon Loft the hazard, while he reaped the benefit. His time was paid for by Loft. The use of the Grace plant was not essential to the enterprise. In such manner he acquired for himself and Grace ninety-one per cent of the capital stock of Pepsi, now worth many millions. A genius in his line he may be, but the law makes no distinction between the wrong doing genius and the one less endowed.

Upon a consideration of all the facts and circumstances as disclosed we are convinced that the opportunity to acquire the Pepsi-Cola trademark and formula, goodwill and business belonged to the complainant, and that Guth, as its president, had no right to appropriate the opportunity to himself.

The Chancellor's opinion may be said to leave in some doubt whether he found as a fact that the Pepsi-Cola opportunity belonged to Loft. Certain it is that he found all of the elements of a business opportunity to exist. Whether he made use of the word "estopped" as meaning that he found in the facts and circumstances all of the elements of an equitable estoppel, or whether the word was used loosely in the sense that the facts and circumstances were so overwhelming as to render it impossible for Guth to rebut the conclusion that the opportunity belonged to Loft, it is needless to argue. It may be said, however, that we are not at all convinced that the elements of an equitable estoppel may not be found having regard for the dual personalty which Guth assumed.

The decree of the Chancellor is sustained.