## ELM CORPORATION et al. v. E. M. ROSENTHAL JEWELRY CO. et al.
### Nos. 9236, 9237, 9238.

United States Court of Appeals
District of Columbia.

Argued Jan. 23, 1947.

Decided May 26, 1947.

---

[1] 88 Cong.Rec.9485 (1942).

Mr. G. Bowdoin Craighill, of Washington, D. C., and Mr. Victor W. Klein, of Detroit, Mich., pro hac vice, by special leave of Court, with whom Messrs. John S. Flannery and Llewellyn C. Thomas, both of Washington, D. C., were on the brief, for the Elm Corporation and Edwin M. Rosenthal, appellants in No. 9236, appellees in Nos. 9237 and 9238.

Mr. Simon Hirshman, of Washington, D. C., entered an appearance for the E. M. Rosenthal Jewelry Co., appellee in No. 9236.

Mr. James C. Wilkes, of Washington, D. C., with whom Mr. George A. Glasgow, of Washington, D. C., was on the brief, for Marcus S. Goldnamer and Helen Goldnamer, appellants in No. 9238 and appellees in Nos. 9236 and 9237.

Mr. Spencer Gordon, of Washington, D. C., with whom Miss Eleanor Sessoms, of Washington, D. C., was on the brief, for Edmund I. Kaufmann et al., appellants in No. 9237, appellees in Nos. 9236 and 9238.

Mr. Charles A. Horsky, of Washington, D. C., also entered an appearance for Edmund I. Kaufmann, and others.

Before GRONER, Chief Justice and CLARK and PRETTYMAN, Associate Justices.

CLARK, Associate Justice.

This case involves a nation-wide chain of credit jewelry shops known as the Kay

Jewelry Stores. The many Kay stores[1] themselves are not parties to this suit, but their conception and creation go to the very essence of the plaintiffs' claim. The case comes to us on an appeal, consolidated with two cross-appeals, from a judgment of the District Court in an action by the Elm Corporation and Edwin M. Rosenthal for a declaratory judgment against defendants ·E. M. Rosenthal Jewelry Company, a corporation, Edmund I. Kaufmann and other officers, directors and stockholders of the Rosenthal Company, and for an accounting from and injunction against the defendants. In general, the judgment appealed from dismissed the complaint as to all the defendants with the exception of Edmund I. Kaufmann and Cecil D. Kaufmann, who were enjoined from influencing or attempting to influence the retail stores to discontinue a certain purchasing arrangement with the Rosenthal Company, and dismissed the complaint in all other respects as to these defendants. The Elm Corporation and Edwin M. Rosenthal appeal from the judgment except as to the granting of the injunctive relief. Edmund I. Kaufmann and Cecil D. Kaufmann appeal from that part of the judgment granting the injunction against them. In addition, Marcus S. Goldnamer and Helen Goldnamer, defendants below, appeal from the judgment in so far as it denied to them certain relief requested by them at pretrial proceedings. The court below, in addition to its final judgment, made special findings of fact and conclusions of law, and filed a memorandum opinion and a supplemental memorandum.

The record discloses a long and close business association between five family groups, three of which are parties to this litigation, banded together in the successful establishment and operation of a large and highly profitable[2] jewelry business, wholesale as well as retail, concentrated primarily along the east coast, but covering 18 states extending as far west as California. Edwin M. Rosenthal, a plaintiff below, and Edmund I. Kaufmann, a defendant below hereinafter referred to as Kaufmann, were intimate personal friends residing in Toledo, Ohio, where Rosenthal carried on a successful furniture business on the installment basis. Kaufmann became associated in the furniture business and later moved to Reading, Pennsylvania, to open up a store there. In 1916 Kaufmann conceived the idea of applying credit buying to the jewelry business, and in that year the first in the chain of Kay[3] retail stores was opened in Reading by Kaufmann and his brother Saul Kaufmann. A corporation was formed for this purpose each brother taking half of the stock. Seven other stores, each a separate corporation, were opened between the years 1919 and 1923. In addition to the Kaufmann brothers, stock in these stores was taken by Rosenthal, Marcus Goldnamer, a defendant below who was introduced to Kaufmann by Rosenthal, A. J. Levy and others, these investments being made on invitation by Kaufmann. The stock taken by these five men in the seven stores varied from 80 per cent. of the total issued to 36.53 per cent. of the total issued.[4] Kaufmann fixed the amount of stock to be taken by each. He also determined the location of each store.

In 1923 Kaufmann decided that the jewelry business could be made more profitable by the forming of a wholesale company to supply the retail stores. He discussed the subject at considerable length with Goldnamer, who, Kaufmann had decided, would be the merchandise man in the wholesale company to be organized. Kaufmann invited his four business associates to a meeting where he presented his idea to them. The result of this conference was the incorporation, under the laws of the District of Columbia, of the E. M. Rosenthal Jewelry Company, a defendant below, with the five men each investing in an interest as specified by Kaufmann, who allo-

---

[1] There were 70 retail stores at the time the suit was filed in 1943.

[2] The parties made millions of dollars from the business.

[3] The name "Kay" was chosen because it was the first letter of the brothers' family name.

[4] Kaufmann's interest varied from 10.5 to 25 per cent.; Rosenthal's from 10.5 to 24 per cent.; Goldnamer's from 4.03 to 25 per cent.; Levy's from 4.03 to 17.09 per cent.; and Saul Kaufmann's from 4.03 to 23.58 per cent.

cated 30 per cent. of the stock to himself,[5] 20 per cent. to Rosenthal,[6] 25 per cent. to Goldnamer,[7] 15 per cent. to Levy[8] and 10 per cent. to Saul Kaufmann.[9] It was agreed to between the stockholders that the wholesale company would furnish goods to the retail stores at the wholesale price plus 10 per cent.

The evidence pertaining to this meeting of the five men indicates that the purpose of organizing the wholesale company was to extend the opportunities for profit making to the wholesale end of the jewelry business. The evidence does not indicate that the wholesale company was to succeed to Kaufmann's right to expand the chain of Kay stores by establishing them wherever he desired with investments by himself or associates of his choosing. The corporation's charter reflects the purpose for which it was organized, limiting its activities to the wholesale jewelry business.

From the time of the organization of the wholesale company on a large number of retail stores were opened up. With reference to these stores, the trial court made the following finding of fact: "Kaufmann in each instance determined finally whether the store should be opened and the amount of stock that should be issued and to whom. As to some of the stores, but not all, the stock issued to E. M. Rosenthal and members of his family and to the wholesale company resulted in the Rosenthal family having an interest in the store of about two-thirds that of the Kaufmann family. Up to 1936 total holdings in all of the stores and in the wholesale house gave Rosenthal family an interest approximately two-thirds of that of the Kaufmann family. Saul Kaufmann's interests in the retail stores, however, were not proportionate to his interest in the wholesale house nor were A. J. Levy's or his family's. There was no agreement either express or implied nor any understanding between the incorporators of the wholesale jewelry company that said corporation should establish or be used to establish or take stock in retail stores for the benefit of the wholesale company or its stockholders. The evidence does not show that any subscriber to the stock of the wholesale company agreed to or had any understanding that he should refrain from opening a retail jewelry store at any place he might choose or that he had given up his right to open up such a store at any place, at least, where he would not be in competition with a store in which the wholesale company had stock. There was an exception on the Pacific Coast and in Texas where a concession was given to a certain David Trattner to open stores."

To further break this down, from 1923 through 1934 33 retail stores were started and there were several reorganizations. While the family groups' interests in the individual stores varied considerably,[10] the over-all average gave the Rosenthal family group an interest approximately two-thirds of that of the Kaufmann family. From 1935 through 1941 18 retail stores were started and there were several reorganizations. With some exceptions, the interests received by the Rosenthal family group[11] were materially less than before, the Kaufmann family interests remained about the same, and the Saul Kaufmann family group, by this time represented by Cecil D. Kaufmann who took an increasingly active part in the business, took substantially larger interests in each of the stores.

Plaintiffs' complaint is directed towards these 18 retail stores established from 1935 through 1941 wherein they received opportunities for investment less than what they allege were due them. It is their contention that in 1923 the five men adopted a plan to expand the jewelry business by starting a wholesale company and by start-

---

[5] Now held by him and his three sons.

[6] Now held, with the exception of one share held by a son-in-law, by the Elm Corporation, a plaintiff below, whose stockholders are Rosenthal's children.

[7] Now held by him and his wife, both defendants below.

[8] Now held by the trustees of his estate with the exception of one share held by a son-in-law.

[9] Now held one-half by his son, Cecil D. Kaufmann, a defendant below, and one-half by Cecil D. Kaufmann as trustee for his sister.

[10] These figures will be treated in detail later.

[11] In 1935 Rosenthal organized the Elm Corporation exchanging all of his interests in the wholesale company, the retail stores and other holdings for its stock. He then made a gift of Elm's stock to his children.

ing additional retail stores with each associate taking a proportional interest measured by their respective share in the wholesale company, that while this plan was carried out as to the stores started from 1923 through 1935, which course of conduct for 13 years shows, they allege, the existence of an implied agreement with respect to the distribution of stock in the retail corporations, it was not carried out in the 18 stores following. Thus, plaintiffs asked the court below to declare that the retail jewelry corporations specified were incorporated by the defendant wholesale company for the benefit of the shareholders of the defendant wholesale company and that the shares of stock and other benefits resulting from the establishment of these 18 retail stores which had come into possession or control of the defendants were received by them in trust for the plaintiff Elm Corporation to the extent of its interest as a shareholder in the defendant wholesale company. They further asked the court to enjoin certain defendants from acting in any way as to impair the relationship existing between the wholesale company and the retail stores; and for an accounting. The Goldnamers, at pretrial, asked for an adjudication of the rights of the shareholders of the wholesale company to participate proportionately in the stock of the retail corporations organized after 1941, and that the 10 per cent. arrangement between the retail stores and the wholesale company be perpetuated.

■■ This case being essentially one of fact, great weight is to be given the findings of the lower court, where the case was tried on oral evidence before the court without a jury. Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides: "Findings of fact shall not be set aside unless clearly erroneous, * * *." It is not our function to retry those facts on appeal. Not only do we find the court's findings supported by ample evidence and not clearly erroneous, but we find the court's conclusions of law

based on these findings of fact and his views expressed in his memoranda opinions in complete accord with our views on the matter.

It is our view in this case that absent an express agreement, and none is alleged, plaintiffs' position necessarily is resolved to the establishment of a pattern in the course of conduct of the parties in order to bring about an implied agreement as to the distribution of stock in the retail stores. Plaintiffs find this pattern arising from the course of conduct followed by the parties during the 13 years 1923 through 1935. They contend that what was done during those years implies an agreement joining the five members together in a joint adventure, that the legal implications flowing from this venture imposed on Kaufmann as managing head a fiduciary duty to the stockholders of the Rosenthal company. They further contend that this practice of stock distribution for 13 years imported to stock holdings in the wholesale company the representation of the right to a proportionate share of the entire enterprise, including proportionate participation in all retail stores organized after the formation of the wholesale company.

Since the essence of plaintiffs' case is the alleged course of action followed for 13 years, we must of necessity carefully analyze just what the parties did during this time. For only by this approach can we determine what merit exists in plaintiffs' contentions presented to us by their appeal.[12]

Our first undertaking is to consider the total number of shares, in percentages, allocated to and received by the five family groups both directly and through the wholesale company in the individual stores established during the period in question. In this consideration we do not deal with the so called "incentive shares" issued to store managers, employees and others. Referring initially to the interests of the Kaufmann and Rosenthal family groups[13] we find that on one occasion each, involv-

---

[12] Where the contentions of the defendants Goldnamers, on their appeal, are in general harmony with those of plaintiffs, reference in the opinion to plaintiffs applies to the Goldnamers.

[13] Hereafter, reference will be made only to the head of the family group, i. e., Kaufmann, Rosenthal, Goldnamer, Levy and Saul Kaufmann.

ing separate stores,[14] neither one took any interest whatever, either directly or through the wholesale company. The instance applying to Kaufmann was the establishment of Kay of Toledo, Ohio, where in contrast to Kaufmann's making no investment, Rosenthal received opportunity to invest in 99.8 per cent. of the total shares going to the five members, the other .2 per cent. investment going to Levy. Thus we see that Rosenthal's opportunities for investment ranged from nothing to 99.8 per cent. In the Franc store in Washington, D. C. wherein Rosenthal received no opportunity for investment, Kaufmann invested in 18.2 per cent. of the total issued to the five members. The upper limit of Kaufmann's varying interests was 48.9 per cent. which was his investment in the second store opened in Springfield, Massachusetts, in which store Rosenthal was allocated 12.6 per cent. The investments made by these two associates in the remainder of the retail stores opened during this period fluctuated between the above noted extremes. As has been stated, the overall result of these varying investments was holdings by Rosenthal equal to approximately two-thirds the holdings of Kaufmann.

As to the remaining three associates it is sufficient to point out that no plan of stock distribution is indicated by their investments in these stores. In the case of Levy there are eight instances where he made no investment at all, while in the case of Saul Kaufmann, individual investments as high as 63.6 per cent., 50 per cent. and 37.5 per cent. in various stores during this period resulted in his holding a proportionate share in the retail stores considerably larger than his proportionate share in the wholesale company.

Since it is clear and not disputed that any interest in a retail store going to the five members through the wholesale company necessarily resulted in their receiving an investment proportionate to the interest held in the wholesale company, it is of further importance to determine what plan, if any, was used in the distribution of stock in the retail stores directly to the five men in instances where the wholesale company was not involved and on those occasions where shares were allocated to some or all of the five members in addition to the allocation to the wholesale company. During the 13 years involved there were 19 instances where direct allocation was made to the five associates. In the first of these stores, Kay of Toledo, out of 500 total shares issued 215 went to the associates. Of these, Rosenthal received 99.8 per cent. and Levy 0.2 per cent., the other three receiving nothing. On the second such occasion, involving the second store opened in Worchester, Massachusetts, out of 600 total shares issued 355 went to the five associates, Kaufmann receiving 19.7 per cent., Rosenthal 14 per cent., Goldnamer 11.5 per cent., Levy 45 per cent. and Saul Kaufmann 9.8 per cent. At only one time in the forming of these 19 stores was the opportunity for investment received by each of the five men proportionate to their interest in the wholesale company. In that instance, Kay of Lynn, Massachusetts, out of 500 total shares issued 275 shares were distributed to the five associates of which Kaufmann took 30.5 per cent., Rosenthal 20.3 per cent., Goldnamer 25.4 per cent., Levy 13.4 per cent. and Saul Kaufmann 10.4 per cent. The remaining stock distributions are indicative of no plan or pattern. And the few instances where direct allocation was made to the associates, in addition to an allocation to the wholesale company, are even less indicative of a plan or pattern since on all of these occasions only some of the associates participated in the direct distribution.

---

14 Plaintiffs refer to these stores as "special situations" which "everyone" admitted should be excluded from any computation, and accordingly do not consider them as part of the "course of conduct." The use of the term "everyone" is apparently the result of the testimony of Goldnamer, whose interests run parallel to plaintiffs' on this point, wherein he stated, when testifying about the Franc Jewelry Company of Washington, D. C.:

"This is what somebody has termed as 'another special case.' Mr. C. D. Kaufmann was given * * *

"Q. That is what you termed it, Mr. Goldnamer. A. I termed it 'special'? Anyhow, whoever it was that did it, it was called a 'special case' by someone."

908

■ The conclusion is inescapable that the course of conduct followed by the parties for 13 years was not such as to give rise to any implication as to a plan or pattern in stock distribution. While the evidence shows the establishment and operation of the wholesale company was closely connected to the operation of the retail business, it does not show that the associates in the wholesale house banded together as joint adventurers to carry on the entire jewelry business, and we are convinced, as was the trial court, "that the understanding was that the wholesale and retail businesses were distinct." Neither the wholesale house nor the individuals were bound, either morally or contractually, to invest in any single enterprise, but were free to accept or reject the opportunity to invest tendered them by Kaufmann. There being no joint adventure, plaintiffs' claim of a right to have opportunity to subscribe to stock in the retail corporations based on Kaufmann's fiduciary duty to his joint adventurers fails for want of a foundation.

■ The views we have expressed above also dispose of the corporate opportunity argument presented by plaintiffs. The conception of the chain of retail stores antedated the establishment of the wholesale company several years. As the trial court found, and as we understand the evidence to show, there was nothing accomplished at the meeting wherein the formation of the wholesale corporation was discussed, or any time, taking away Kaufmann's right to establish new retail stores and giving it to the wholesale company. We think the evidence clearly shows that the opportunity to establish new Kay retail stores belonged to Kaufmann, not to the wholesale corporation. We find nothing wrong with the generalities concerning the rule of corporate opportunity urged upon us by plaintiffs as set out in the case of Guth v. Loft, Inc.,[15] heavily relied on by them, or with the court's application of those general rules to the facts of that case. But the circumstances existing in that case are so different than those we have here, that while the court was there justified in finding the existence of a corporate opportunity, we can not do so in the case at bar since the circumstances necessary to the establishment of a corporate opportunity are lacking.[16]

What we said earlier in this opinion concerning the trial court's findings of fact and conclusions of law as applied to the stock distribution aspect of this case applies equally to the injunctive relief granted by the court. The trial Court's findings of fact were that:

"9. Each of the retail stores has been paying the wholesale company for goods bought from it the cost price to the wholesale company plus 10% of the wholesale price and a like percentage on goods bought from other sources. Edmund I. Kaufmann has stated that he would resign as president of the wholesale company and would advise the retail units they could buy their merchandise anywhere they wanted to. Such action would greatly injure if not practically destroy the business of the wholesale company. As president of the wholesale company and as a director of some of the retail stores he occupies a position of trust and should not attempt in any way to influence the action of the retail stores in this matter.

"10. Cecil D. Kaufmann has evinced a degree of hostility toward the Rosenthal family which warrants the issuance of an injunction against him so long as he remains a director of the E. M. Rosenthal Jewelry Company."

In the court's memorandum opinion he states: "The request for an injunction to restrain Mr. E. I. Kaufmann from advising or attempting to bring about a termination of the 10% arrangement presents some difficulties. That agreement was not made with the companies but was simply an agreement between the five men who or-

15 23 Del.Ch. 255, 5 A.2d 503.
16 Solimine v. Hollander, 128 N.J.Eq. 228, 16 A.2d 203; Diedrick et al. v. Helm et al., 217 Minn. 483, 14 N.W.2d 913, 153 A.L.R. 649; Lancaster Loose Leaf Tobacco Co. v. Robinson, 199 Ky. 313,

250 S.W. 997; Note, Liability of Directors for Taking Corporate Opportunities, Using Corporate Facilities or Engaging in a Competing Business, 39 Col.L.Rev. 219 (1939).

ganized the wholesale company that the charge should be imposed upon the retail companies. The arrangement has been highly profitable to the wholesale company, and without it that corporation would be a little more than a shell. The arrangement has been accepted by the retail companies apparently without complaint, but perhaps because of the dominating influence of the wholesale company. It may be disadvantageous to the retail companies. Mr. E. I. Kaufmann is a director and officer of the wholesale company and an officer or director of the retail companies. In my opinion he should be neutral on this question. He has threatened to use his influence to terminate the contract. I think he should be restrained from doing anything towards that end. The stockholders of the retail stores should be allowed to determine whether, or how long, to continue the contract uninfluenced by the holders of the stock in the wholesale company."

And in the court's supplemental memorandum: "While I have been of the opinion there is no such relationship between E. I. Kaufmann and E. M. Rosenthal as to require Kaufmann to give Rosenthal a right to subscribe for stock in the retail corporations organized by him or under his direction in proportion to Rosenthal's interest in the wholesale company, still Kaufmann's relations with the wholesale company were such that he should not be permitted to take any action which would disturb the business arrangements now and heretofore existing between the retail and the wholesale establishments. In my opinion no such relationship (except as a director of the wholesale company, which I shall take up presently) exists between C. D. Kaufmann and the wholesale company."

We find no error in the findings of the court, or in his legal conclusions based thereon. He accordingly acted correctly in granting some form of relief, and because of the singular nature of the case, was not governed by any existing authority bearing directly on this point. The relief which may be granted is not restricted to any particular form, but may be moulded to fit the facts and circumstances of the particular case, and to remedy the existing inequity.[17] While it is true that the injunctive orders pertaining to the Kaufmanns border on being vague, and could well have been couched in more specific terms, still, we feel their meaning is reasonably apparent, and we refrain from taking any action other than to affirm them as they are. Concerning the order applying to C. D. Kaufmann, which remains in effect only "during such period as he is or may be an officer or director of the E. M. Rosenthal Jewelry Company", if the statement supplied in the briefs of counsel, although not appearing in the record, is correct that he has since ceased to be such an officer or director, then the terms of the injunction pertaining to him are rendered nugatory.

Affirmed.

---

[17] 1 Pomeroy, Equity Jurisprudence Sec's. 109, 111 (5th Ed. 1941).