# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE RIVERSTONE NATIONAL,   )
INC. STOCKHOLDER               )  Consol. C.A. No. 9796-VCG
LITIGATION                     )

## <u>MEMORANDUM OPINION</u>

Date Submitted:  April 6, 2016
Date Decided:  July 28, 2016

S. Mark Hurd and Ryan D. Stottmann, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL:  Danny David and Amy Pharr Hefley, of BAKER BOTTS L.L.P., Houston, Texas, *Attorneys for Plaintiffs Michael C. Halpin and Michael A. Christian*.

Kevin R. Shannon and Christopher N. Kelly, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL:  Anthony M. Candido, Robert C. Myers, and Sarah A. Sulkowski, of CLIFFORD CHANCE US LLP, New York, New York, *Attorneys for Defendants Nicholas C. Gould, Peter E. Gould, CAS Capital Limited, and Michael Pearson*.

Blake Rohrbacher, Robert L. Burns, and Andrew J. Peach, of RICHARDS, LAYTON & FINGER, PA, Wilmington, Delaware; OF COUNSEL:  Harry H. Schneider, of PERKINS COIE LLP, Seattle, Washington, *Attorneys for Defendants Riverstone National, Inc., Terry Danner, and MarySusan Wanich*.

GLASSCOCK, Vice Chancellor

This litigation principally concerns an allegation that a board of directors disloyally facilitated a merger, which merger forestalled a suit against them by stockholders acting derivatively on behalf of the company. That potential litigation, threatened but not yet pending as of the merger date, involved an alleged usurpation of corporate opportunity by a majority of the directors. The merger was consummated, and the acquirer, purchaser of the purported chose-in-action, waived the right to pursue such action in the merger agreement. Thus, according to the ex-stockholder plaintiffs, the corporate asset was lost and was not accounted for in the merger consideration, which as a result was unfair. At the same time, the defendant directors—to the extent they were stockholders—received the same benefit as the other stockholders, but they received an additional benefit not so shared: they were relieved of potential liability they faced in the usurpation claim.

Thus framed, the current motions to dismiss are rather simple to resolve. In briefing, the parties approached the Plaintiffs' claim as one controlled by this Court's reasoning in *In re Primedia, Inc. Shareholders Litigation*.[1] That case involved stockholders pursuing a derivative claim against a corporate controller at the time of a merger. The derivative claim was extinguished by the merger. *Primedia* considered whether the ex-stockholders' subsequent litigation challenging the merger represented a direct claim of unfairness, rather than an improper attempt to

---

[1] 67 A.3d 455 (Del. Ch. 2013).

1

pursue the extinguished derivative claim; the Court thus undertook a careful examination of the plaintiffs' standing to proceed. The parties here disagree as to whether the Plaintiffs lack standing under the test announced in *Primedia*; in briefing, the parties engaged heavily on this esoteric issue. To my mind, the issue here is more fundamental: this matter involves a common or garden variety allegation of director interest, in direct challenge to the merger as unfair. As I find below, the complaint pleads, plausibly, that a chose-in-action against a majority of directors existed, pre-merger, for usurpation of corporate opportunity; that a claim brought on that ground derivatively would have withstood a motion to dismiss; that such an action by stockholders was threatened, and that threat was known to the board, at the time the company contemplated and negotiated the merger; that the implied liability was material to the directors so threatened; and that the merger agreement the directors obtained and recommended both eliminated the threatened derivative suit by operation of law, *and* eliminated *any* pursuit of the matter as a corporate asset purchased by the acquirer, as a matter of contract. Thus, the complaint adequately alleges, under these particular facts, that a majority of the Defendant directors received a material benefit from the merger not shared by the common stockholders. Since this majority was interested in the transaction, they must demonstrate that the merger was entirely fair to the stockholders, in light of a plausible allegation of unfair price. This matter, therefore, involves a direct attack

on the fairness of the merger. Any potential derivative actions have been extinguished; what remains are the Plaintiffs' allegations that the Defendant directors were interested in the merger and that the price was unfair, a direct claim belonging to the Plaintiffs. For the reasons limned above and discussed in detail below, the Defendants' motions to dismiss are largely denied. My reasoning follows.

## I. BACKGROUND[2]

### A. *The Parties*

Plaintiffs Michael C. Halpin and Michael A. Christian are former minority stockholders of Defendant Riverstone National Inc. ("Riverstone" or the "Company").[3]

Defendant CAS Capital Limited ("CAS Capital") was the majority stockholder of Riverstone.[4] CAS Capital is a private limited company organized under the laws of England and Wales, with its principal place of business in London.[5]

At the time of the merger at issue here, Defendants Nicholas Gould, Peter

---

[2] The facts are drawn from the Plaintiffs' Verified Complaint filed on October 9, 2015 (the "Complaint" or "Compl.") and are presumed true for purposes of evaluating the Defendants' Motions to Dismiss.

[3] Compl. ¶ 1. The Complaint states that the Plaintiffs together owned 132,625 shares of common stock. *Id.* at ¶ 4. While the Plaintiffs allege that their stock represented 1.2698% of the Company following a transaction that was completed in 2009, *id.* at ¶ 20, their percentage ownership at the time of the merger is unclear from the pleadings.

[4] *Id.* at ¶ 7. The Complaint does not state CAS Capital's percentage ownership in Riverstone. According to the Defendants' opening brief, it owned 91.5542% of the outstanding shares at the time of the merger. Defs' Opening Br. 4.

[5] Compl. ¶ 7.

Gould, Michael Pearson, Terry Danner, and MarySusan Wanich constituted the board of directors of Riverstone (the "Director Defendants").[6] Furthermore, Danner was the Company's CEO and Wanich was its COO at the time of the merger.[7] Nicholas Gould and Peter Gould (together, the "Goulds") owned and controlled CAS Capital, Riverstone's aforementioned majority stockholder, as well as its non-party affiliate Regis Group Plc ("Regis"), at the time of the merger.[8]

*B. Riverstone's Involvement with Invitation Homes and B2R*

Headquartered in Dallas, Texas,[9] Riverstone was the nation's second largest privately owned, fee-based apartment property management company as of 2008.[10] Following the financial crises of 2008, Riverstone became interested in the single-family property market, as opposed to the multi-family property market in which it had traditionally focused.[11] According to the Complaint, the Company saw an opportunity to take advantage of depressed home prices by "purchasing, rehabilitating, and leasing homes and, thereafter, managing the leases."[12]

On January 30, 2012, Riverstone hired Paul Carbone as an independent contractor to create a financial model to assess the "financial feasibility of

---

[6] *Id.* at ¶¶ 5–6, 8–10.
[7] *Id.* at ¶¶ 9–10.
[8] *Id.* at ¶¶ 5–6, 36.
[9] *Id.* at ¶ 11.
[10] *Id.* at ¶ 16. According to the Complaint, Riverstone is included in the action as a necessary party and to "ensure the Court's ability to grant complete relief to Plaintiffs." *Id.* at ¶ 11.
[11] *Id.* at ¶ 21.
[12] *Id.*

[Riverstone] successfully implementing the acquisition and management of a large-scale portfolio of Single Family Residences in multiple U.S. markets and to create a Business Plan that will serve as a framework for the execution of the potential business venture."[13]  Shortly thereafter, Riverstone hired Jefferies & Company Inc. ("Jefferies") to locate institutional investors to further its business plan to purchase single-family residences on a large scale.[14]  Pursuant to the engagement, Jefferies developed a presentation for the "Riverstone Residential Group," in which it outlined a representative structure for the business that included Riverstone "functioning as both a limited partner of the proposed fund, entitled to receive preferred returns, and as the general partner for the fund, with management responsibilities and the right to receive promoted or carried interest."[15]

Jefferies soon advised Riverstone to partner with an "operator" with experience buying homes and then together seek to raise additional capital.[16] Jefferies introduced Riverstone to such an operator, the Treehouse Group ("Treehouse"), an Arizona-based company that had experience acquiring and renovating single-family homes on a smaller scale than the business plan envisioned

---

[13] *Id.* at ¶ 22 (quotation marks omitted).
[14] *Id.* at ¶ 23.
[15] *Id.*  The Complaint does not define the "promoted or carried interest" in detail.  I note that a "promote" interest generally refers to a share of the profits of a fund.  According to the Defendants, such interests are "commonly given to senior management in private-equity-backed businesses." Defs' Opening Br. 10.
[16] Compl. ¶ 24.

by Riverstone.[17]  The two companies ultimately partnered together to execute Riverstone's business plan.[18]

In March 2012, Riverstone, together with Treehouse, Jefferies, and Regis—a CAS Capital affiliate—worked to develop a model to present to institutional investors.[19] Together, the group devised the Treehouse Residential Fund, LP ("Treehouse Residential").[20] Treehouse Residential was marketed to institutional investors as a "national platform with the proven ability to acquire, renovate, lease, and manage single-family rental homes to an institutional standard."[21]  Although a separate entity, Treehouse Residential drew from Riverstone's expertise and resources, and relied heavily on the Company's national infrastructure to swiftly "enter markets and build scale."[22]

Riverstone, Treehouse, Jefferies, and Regis pitched Treehouse Residential to several institutional investors in late March 2012.[23]  Ultimately, Blackstone Group LP ("Blackstone") agreed to "help execute" the Treehouse Residential business plan which, in the months that followed, would come to be known as Invitation Homes.[24]

Formed as a Delaware limited partnership in June 2012, Invitation Homes

---

[17] *Id.*
[18] *Id.*
[19] *Id.* at ¶ 25.
[20] *Id.*
[21] *Id.*
[22] *Id.* at ¶ 26.
[23] *Id.* at ¶ 27.
[24] *Id.*

quickly grew to be the nation's largest single-family rental company.[25]  In sum, Blackstone spent over $7.5 billion amassing a portfolio of approximately 45,000 single-family homes through Invitation Homes.[26]

In addition to its role in Invitation Homes, Riverstone "assisted" Blackstone in the development of B2R, also a Delaware limited partnership.[27]  B2R provides "residential buy-to-rent mortgages for property investors" who are focused on amassing large single-family home portfolios.[28]

Although Riverstone never received an ownership interest in Invitation Homes, it "remained integral to the Invitation Homes business model."[29]  In its marketing materials prepared for banks, for example, Invitation Homes described Riverstone as supporting its "comprehensive national platform" and indicated that it planned to rely on Riverstone's "capabilities and systems," such as Riverstone's nationwide office locations, to support its business.[30]  In this regard, Riverstone entered into a series of agreements with Blackstone to serve as its property manager. On April 13, 2012, Riverstone Residential CA, Inc., a Riverstone subsidiary, entered into an Interim Management Agreement with THR California, LLC, a Blackstone entity, pursuant to which Riverstone agreed to "supervise and direct the management

---

[25] *Id.* at ¶ 28.
[26] *Id.*
[27] *Id.* at ¶ 29.
[28] *Id.*
[29] *Id.* at ¶ 30.
[30] *Id.*

and operation" of the properties.[31] Eventually, Riverstone and Blackstone, through various subsidiaries, executed a formal Management Agreement.[32] Later, on October 11, 2012, Riverstone, through its subsidiary CAS Residential, LLC, entered into a Services Agreement with THR Property Management, LP, a Blackstone entity and Invitation Homes affiliate, to serve as property manager for the properties acquired by Invitation Homes.[33]

Due to its early involvement in developing Invitation Homes, and through its various services agreements, the Invitation Homes concept quickly became integral to Riverstone's business. By July 2012, Riverstone had created a separate division solely dedicated to the management of the single-family properties purchased by Invitation Homes.[34] In addition, Riverstone advanced significant funds to develop Invitation Homes. During the early months of 2012, for example, Riverstone advanced more than $200,000 for "various services and expenses in furtherance of the Invitation Homes project."[35]

During this time, some of Riverstone's directors were providing services directly to Invitation Homes. In some instances, Riverstone would facilitate payments to those directors for services rendered to Invitation Homes, and for

---

[31] *Id.* at ¶ 31.
[32] *Id.*
[33] *Id.* at ¶ 32.
[34] *Id.* at ¶ 34.
[35] *Id.* at ¶ 35.

reimbursement of expenses incurred on Invitation Homes' behalf. For example, to facilitate payments to the Goulds for services rendered to Invitation Homes, Riverstone would pay Regis—an entity controlled by the Goulds—for "Consultancy Services," and Riverstone would in turn seek reimbursement from Invitation Homes.[36] Riverstone also paid for an apartment rented by Peter Gould and later sought reimbursement from Invitation Homes.[37] Likewise, Riverstone paid Pearson for services rendered directly to Invitation Homes and Riverstone would thereafter seek reimbursement from Invitation Homes.[38]

Riverstone similarly supported B2R. In June and July 2013, the Company advanced more than $390,000 for "B2R-related costs, including, among others, salaries, travel expenses, legal fees, and marketing costs."[39] In addition, Jeff Tennyson, B2R's eventual COO, was initially paid by Riverstone and worked out of its offices.[40]

*C. Riverstone Directors and Officers Receive Ownership Interests in Invitation Homes*

While Riverstone never received an ownership interest in Invitation Homes, many of Riverstone's directors and officers were given that opportunity and did invest. During a special board meeting in October 2012, the Riverstone board

---

[36] *Id.* at ¶ 36.
[37] *Id.*
[38] *Id.* at ¶ 37.
[39] *Id.* at ¶ 39.
[40] *Id.*

"acknowledged that certain members of the Board, officers and executives of the [Company] and its affiliates may elect to acquire ownership interests in Invitation Homes."[41] At the meeting were Defendants Nicholas Gould, Peter Gould, Michael Pearson, as well as non-party directors Walter Smith and Pål Ottesen, and Riverstone's General Counsel Michael Hoffman.[42] Each of the directors and officers present at the meeting had already received an opportunity to acquire an ownership interest in Invitation Homes.[43] Defendant Terry Danner, who did not attend or participate in the meeting, did not receive an opportunity to acquire an ownership interest in Invitation Homes.[44] Defendant MarySusan Wanich, I note, was not yet a director of the Company.

According to the Plaintiff, the board knew that the opportunity to invest in Invitation Homes presented a conflict of interest in connection with directors and officers taking the opportunity for themselves.[45] Accordingly, in "approving the acquisitions" of Invitation Homes, the board "purported to waive any actual or potential conflict of interest."[46]

According to the Amended and Restated Limited Partnership Agreement of Invitation Homes dated October 11, 2012, all of the members of the Riverstone

---

[41] *Id.* at ¶ 43 (quotation marks omitted).
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] *Id.* at ¶ 44.
[46] *Id.*; *see infra* note 123.

10

board at that time, with the exception of Danner, were listed as Class A Limited Partners of Invitation Homes.[47] In addition, each was given the opportunity to receive Class B and C units, which entitle holders to derive "promote" or "carried interest" from Invitation Homes' operations.[48]  In order to receive Class B and C units, the Class A Limited Partners were required to make deferred capital contributions.[49]  Certain Riverstone officers were also offered Class B and C units; Steve Donohue, Riverstone's President of the Single-Family Homes Division, and Michael Hoffman, Riverstone's General Counsel, were each given the opportunity to purchase Class B and C units in exchange for deferred capital contributions.[50]  In total, Riverstone's officers and directors were offered approximately 70% of Invitation Homes' Class B and C units.[51]  All of the officers and directors noted above, with the exception of then-directors Smith and Ottesen, made the required deferred capital contributions in exchange for Class B and C units.[52]

In addition to their interests in Invitation Homes, Nicholas and Peter Gould

---

[47] Compl. ¶ 41.

[48] *Id.*

[49] *Id.* at ¶ 45.  The Complaint does not describe the nature of the deferred capital contributions.

[50] *Id.* at ¶ 42.

[51] *Id.*

[52] *Id.* at ¶ 45.  Notably, the following deferred capital contributions were required:  $1,900,000 from Nicholas Gould, $2,600,000 from Peter Gould, and $150,000 from Michael Pearson.  *Id.* at ¶ 41.  In order to receive the Class B and C units, the Plaintiffs explain, the Goulds were also required to make additional contributions of $9,500 and $500, respectively, and Pearson was required to make additional contributions of $1,490 and $78, respectively.  *Id.*

11

were offered ownership interests in B2R.[53]   The Goulds and Pearson were also offered positions at Invitation Homes and B2R: all three became officers of Invitation Homes,[54] and Nicholas Gould was appointed to serve as B2R's Executive Chairman.[55]   Moreover, Regis listed both Invitation Homes and B2R among its United States businesses at the time of the Complaint.[56]

*D. Challenged Contributions to Riverstone*

The Complaint also challenges the classification of certain contributions to Riverstone.  At the time of the Complaint, CAS Capital and Regis had made various contributions—as characterized by the Plaintiffs—to Riverstone that totaled approximately $20 million (the "Contributions").[57]   Although Riverstone recorded the Contributions as debts "due to affiliates," there are no written loan agreements stating the terms and conditions of the "loans."[58]   Furthermore, there is no documentation indicating that these "loans" were approved by the board.[59] According to the Plaintiffs, the Contributions were improperly classified as indebtedness and should have been classified as paid-in capital (or equity) instead.[60]

---

[53] *Id.* at ¶ 49.
[54] *Id.* at ¶ 41.
[55] *Id.*
[56] *Id.*
[57] *Id.* at ¶ 51.
[58] *Id.*
[59] *Id.*
[60] *Id.* at ¶ 52.

*E. Plaintiffs Demand Books and Records from Riverstone*

On May 20, 2014, the Plaintiffs informed Riverstone of their claim that Riverstone's directors and officers breached their fiduciary duty by improperly usurping the opportunity to invest in Invitation Homes.[61] The Plaintiffs demanded that all of the equity interests in Invitation Homes owned by Riverstone directors, officers, employees, and affiliates be assigned and transferred to Riverstone.[62] The Plaintiffs also demanded that they be allowed to inspect Riverstone's books and records.[63] In response, the Company refused to make books and records available to the Plaintiffs.[64]

The Plaintiffs sent a second books and records demand letter on May 29, 2014.[65] In its second demand, the Plaintiffs requested information regarding the Contributions and demanded a written confirmation that the Contributions would be treated as equity contributions rather than debt.[66]

On May 30, 2014, the Plaintiffs initiated a suit under Section 220 of the Delaware General Corporate Law ("DGCL"), seeking an order compelling Riverstone to provide the Plaintiffs with certain books and records relating to the

---

[61] *Id.* at ¶ 53.
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.* at ¶ 54.
[66] *Id.*

demands discussed above.[67]

*F. Riverstone Merges with Greystar*

On May 30, 2014, the same day the Plaintiffs filed their 220 action, Riverstone executed an Agreement and Plan of Merger (the "Merger Agreement") among Greystar Real Estate Partners, LLC ("Greystar"), Greystar Merger Sub Inc. ("Greystar Merger Sub"), and CAS Capital.[68] The Merger Agreement provided that Greystar Merger Sub would merge with and into Riverstone (the "Merger"), and all of Riverstone's issued and outstanding shares of common stock would be converted into the right to receive cash.[69] Meanwhile, on the previous day, CAS Capital, as majority stockholder of Riverstone, had executed and delivered its written consent to the Merger.[70]

Pursuant to the Merger Agreement, Riverstone's stockholders were entitled to a right to receive cash equal to their pro-rata share of the $94 million purchase price less certain adjustments to be made for Riverstone's "indebtedness and working capital at the time of closing and any escrow amounts."[71] Accordingly, the contested Contributions, which were accounted for as "unsecured debts due affiliates," served to reduce the amount of cash consideration available for distribution to

---

[67] *Id.* at ¶ 55.
[68] *Id.* at ¶ 57.
[69] *Id.*
[70] *Id.*
[71] *Id.* at ¶¶ 57–58.

stockholders.[72]   As of the date of the Merger Agreement, the estimated closing payment after adjustments totaled $50,379,882.[73]   The Merger later closed on June 2, 2014.[74]   According to the June 9, 2014 Information Statement provided to Riverstone's stockholders, any stockholder who relinquished their rights to seek appraisal was entitled to receive $4.44 per share.[75]

At the time of the Merger, the Riverstone board consisted of Nicholas Gould, Peter Gould, Pearson, Danner, and Wanich (collectively, the "Merger Board").[76] The Plaintiffs assert that, at the time of the Merger, the Merger Board, along with CAS Capital, and Greystar, were aware of the Plaintiffs' claims regarding the usurpation of corporate opportunities and the misclassification of the Contributions.[77]   Nonetheless, according to the Plaintiffs, the Merger Agreement provided that the acquirers would release such claims.[78]

*G. Procedural History*

Following the Merger, the Plaintiffs filed an appraisal action in this Court on June 19, 2014.  More than a year later, on October 9, 2015, the Plaintiffs filed a separate action, asserting claims of breach of fiduciary duties in connection with the

---

[72] *Id.* at ¶ 58.
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.* at ¶ 59.
[77] *Id.*
[78] *Id.* at ¶ 63.

Merger. The two cases were consolidated on March 16, 2016.[79] Before me are the causes of action for breach of fiduciary duties; the appraisal portion of the consolidated action remains pending and is not at issue here.

The Plaintiffs' Verified Complaint dated October 9, 2015 asserts two causes of action for breach of fiduciary duties. Count I is alleged against the Director Defendants. The Plaintiffs assert that Riverstone officers and directors, including Pearson and the Goulds, breached their fiduciary duties and usurped a corporate opportunity owed to Riverstone by investing in Invitation Homes and B2R (the "Usurpation Claims"). In addition, they assert that the Director Defendants breached their fiduciary duties when they either directed or acquiesced in the improper classification of the Contributions (the "Misclassification Claim"). Accordingly, the Plaintiffs allege that the Director Defendants, who composed the Merger Board, violated their fiduciary duties in connection with the Merger when they failed to obtain consideration for the value of the Usurpation and Misclassification Claims. According to the Plaintiffs, the value of those claims are material in the context of the Merger and thus the price is unfair.

Count II is alleged against CAS Capital and follows the claims asserted in Count I. The Plaintiffs assert that CAS Capital was the controlling stockholder of

---

[79] *See In re Riverstone Nat'l, Inc. S'holder Litig.*, C.A. No. 9796-VCG (Del. Ch. Mar. 16, 2016) (ORDER).

16

Riverstone and therefore owed fiduciary duties to the Plaintiffs. They allege that CAS Capital breached its fiduciary duties in connection with the Merger when it failed to obtain any value for the Usurpation and Misclassification Claims.

In relief, the Plaintiffs seek an order directing the Defendants to account for all damages resulting from their breaches; an award of compensatory damages against the Defendants arising from their breaches; an order directing disgorgement and/or the creation of a constructive trust with respect to any benefit received by any of the Defendants as the result of their breaches; and an award equal to the Plaintiffs' fees and expenses associated with this action.

The Defendants filed separate Motions to Dismiss the Complaint on December 16, 2015. Following combined briefing on the motions, I held oral argument on April 6, 2016. This is my Memorandum Opinion.

## II. ANALYSIS

When evaluating a motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff.[80] The motion will be denied unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[81]

The Plaintiffs attack the fairness of the merger price and process. They allege

---

[80] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 537 (Del. 2011).
[81] *Id.*

17

that the Defendants were interested in the Merger and that the merger consideration was unfair to the minority stockholders. Specifically, the Plaintiffs argue that the Defendants failed to obtain value for two potential derivative claims, assertable against the Defendants and owned by Riverstone pre-merger, which were extinguished pursuant to the terms of the Merger Agreement. My analysis begins with the applicable standard of review. I conclude that the Complaint adequately alleges that a majority of the Director Defendants were interested in the Merger, and that the Plaintiffs have alleged sufficient facts to show that the Merger was unfair. Accordingly, entire fairness review applies. The fact that the issue of standing consumed most of the briefing notwithstanding, I need not address whether the Plaintiffs have standing under *Primedia*, having already determined that the Plaintiffs have stated a direct claim for which entire fairness applies.

Second, I address the Plaintiffs' allegation that the Defendants misclassified the Contributions, concluding that the Plaintiffs have failed to state a claim on which relief may be granted. Finally, I turn to the parties' arguments regarding the uninterested Director Defendants, CAS Capital, and Riverstone, concluding that the latter is dismissed. My analysis follows.

A.      *Entire Fairness Review Applies to the Merger*

The Defendants argue that the Plaintiffs' claims must be dismissed because they are subject to the presumption of the business judgment rule. It is fundamental

18

to our model of corporate law that the directors, and not the stockholders—the owners—control the corporation. It is equally fundamental that such control is not shared by the courts, in pursuit of which salutary rule the business judgment rule exists. Directors are presumed to act in the best interest of the corporation, and their independent and disinterested actions in that regard are therefore largely insulated from review.[82] Where grounds to rebut the business judgment rule are adequately pled, however, a court may hold directors accountable for corporate decisions.[83] It is true that, in the context of a merger, challenged before consummation, this Court will apply a higher standard of review—enhanced scrutiny—which allows injunctive relief to protect the stockholder's interest in receiving best value for their shares.[84] Even in the merger context, however, where, as here, ex-stockholders challenge the fairness of a merger and seek damages from the directors, the stockholders must plead facts that, if true, rebut business judgment and demonstrate a non-exculpated breach of duty; otherwise judicial review ends.[85] Where the

---

[82] Excepting only actions deemed waste or in bad faith. See *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (citations omitted), *overruled on other grounds by Brehn v. Eisner*, 746 A.2d 244 (Del. 2000).

[83] *Id.*

[84] Once directors have made the decision to sell the company, their focus must shift to one objective: obtaining the best price for stockholders. *See, e.g.*, *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986). In this scenario, our case law provides for enhanced judicial scrutiny, pre-merger, to ensure a reasonable process has been followed to that aim, and to ensure that injunctive relief (as opposed to post-merger damages, which typically imply a breach of the duty of loyalty) is available to protect the stockholders. *See Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 312 (Del. 2015).

[85] *See Corwin*, 125 A.3d at 312 (noting that enhanced scrutiny is incompatible with a damages action, post-closing); *see also Sing v. Attenborough*, 2016 WL 2765312, at *1 (Del. May 6, 2016)

19

stockholders do plead particularized facts in connection with a board action which, if true, demonstrate that the directors acted in a way that strips them of the protections of the business judgment rule—as where their loyalty is divided between corporate interest and material self-interest—then the standard of review is entire fairness, and the directors must demonstrate that the merger developed a fair price from a fair process.[86]

Relevant to this case is whether a majority of the directors were disinterested and independent. A director may be interested in a transaction where she appears on both sides of a transaction or expects to derive a personal financial benefit separate from the benefits bestowed to stockholders generally.[87] Similarly, a director may lack independence if, rather than basing a decision on the merits to the corporation, she grounds a decision on "extraneous considerations or influences."[88]

Here, the Plaintiffs allege that the Director Defendants had acted disloyally by usurping a corporate opportunity, and that as a result the Company held as an asset a chose-in-action against them for breach of duty. The Director Defendants, however, negotiated a merger, in which all assets passed to the acquirer, but in

---

(ORDER) (noting that the damages liability standard for a disinterested fiduciary for breach of the duty of care is gross negligence, even in a change-of-control transaction).

[86] *E.g.*, *New Jersey Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *8 (Del. Ch. Sept. 30, 2011) (citing *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009)).

[87] *Aronson*, 473 A.2d at 812 (citations omitted).

[88] *Id.* at 816.

connection with which the acquirer agreed not to pursue litigation including, implicitly, the Usurpation Claims. Thus, the chose-in-action, as an asset, was not sold, but was obliterated, and the directors received a special benefit by the sale: relief from potential liability. Thus, according to the Complaint, the Director Defendants are not disinterested actors in the merger, and they are not entitled to the business judgment presumption.

The Defendants first try to characterize the Plaintiffs' Complaint as a disguised pursuit of the Usurpation Claims, which were derivative in nature and thus extinguished by the Merger. The Plaintiffs hotly contest that characterization, arguing that they have standing under this Court's analysis in *Primedia*.[89] I need not consider that issue further here. *Primedia* involved an existing derivative suit against a corporate controller, which was extinguished by merger. The plaintiff ex-stockholders then sought to pursue the matter as a direct action, alleging that no value had been negotiated for the litigation asset, and that the acquirer did not intend to pursue it. The question followed whether the ex-stockholders had standing to pursue that claim directly, in challenge to the merger.

Here, by contrast, the ex-stockholders bring a direct claim: that the merger was unfair. They undoubtedly have standing to do so.[90] If they can demonstrate, in

---

[89] 67 A.3d 455.
[90] *E.g.*, *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999) ("A stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the

light of plausible allegations of self-interest, that the business judgment rule is inapplicable, the burden will fall on the Defendants to show entire fairness. The Complaint alleges facts in line with the analysis above: that by orchestrating a merger that extinguished a possible derivative action, the Director Defendants obtained a special benefit for themselves, and were thus interested in the transaction.

The Court must be wary of such an allegation. If a conclusory allegation—that a potential derivative suit against directors existed, but was extinguished by a merger—was sufficient to show that directors were interested in the merger, much ground for strike suits and other mischief would be possible. Here, however, the Plaintiffs plead particularized facts with respect to individual directors showing the existence of a chose-in-action against the directors which, if brought as a claim would have survived a motion to dismiss; that the director at the time of negotiating and recommending the merger was aware of the potential action; that the potential for liability was material to the director; and that the directors obtained and recommended an agreement that extinguished the claim directly by contract. Where, as here, such a pleading is made with respect to a majority of the directors, the complaint is sufficient to rebut the business judgement rule. In evaluating the motions to dismiss below, I examine each factor above, in turn, finding that entire

corporation, and may pursue such a claim even after the merger at issue has been consummated.") (citations omitted).

22

fairness review applies.

1. <u>A chose in action for usurpation of a corporate opportunity was a viable claim pre-merger.</u>

In their Complaint, the Plaintiffs assert that they have pled the pre-merger existence of a reasonably conceivable claim for usurpation of corporate opportunities in breach of the duty of loyalty. The Plaintiffs contend that at least three individual directors constituting a majority of the board—Nicholas Gould, Peter Gould, and Michael Pearson—took for themselves opportunities properly belonging to the Riverstone. I address this inchoate claim in light of a theoretical motion to dismiss.

To plead a claim for usurpation of corporate opportunities, a plaintiff must plead that the fiduciary has seized for himself an opportunity that, because of its nature, loyalty dictates should have been presented to his corporation. Four factors have been identified by our Supreme Court as important to this analysis:

> (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.[91]

The Plaintiffs have identified two purported corporate opportunities which they allege a majority of the Director Defendants usurped: they argue that the

---

[91] *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996).

23

Defendants took for themselves the investments in Invitation Homes and B2R. I analyze the Usurpation Claims in light of the four elements that support a claim for usurpation of a corporate opportunity, below.

### a. Financial Viability of the Opportunity

In order to plead a claim for usurpation of corporate opportunities, the corporation must be financially able to exploit the opportunity at issue. The court, I note, is given flexibility in determining whether such an opportunity is financially viable. In *Yiannatsis v. Stephanis*,[92] the Delaware Supreme Court declined to adopt an "insolvency-in-fact" test and noted that a court can consider various options and standards for determining financial ability.[93] Since *Yiannatsis*, Delaware courts have applied various standards to determine a corporation's financial ability, including the "insolvency-in-fact" test,[94] as well as considering whether the corporation is in a position to commit capital, notwithstanding the fact that the corporation is actually solvent.[95] Consistent with the discretion afforded the court to determine financial

---

[92] 653 A.2d 275 (Del. 1995).

[93] *Id.* at 279 n.2.

[94] *See Gen. Video Corp. v. Kertesz*, 2008 WL 5247120, at *19 (Del. Ch. Dec. 17, 2008) ("It has been said, however, that such financial inability must amount to insolvency to the point where the corporation is practically defunct. Mere technical insolvency, such as inability to pay current bills when due or mere inability to secure credit, will not suffice. The corporation must be actually insolvent (quoting *Yiannatsis*, 1993 WL 437487, at *4)) (footnotes and citations omitted).

[95] *Compare Balin v. Amerimar Realty Co.*, 1996 WL 684377, at *9 (Del. Ch. Nov. 15, 1996) ("[A]s the Supreme Court has recognized, even a solvent corporation may be deemed financially incapable of availing itself of an opportunity, where the corporation 'was not in the position to commit capital to the acquisition of new assets.'") (citing *Broz*, 673 A.2d at 155), *with Gen. Video Corp.*, 2008 WL 5247120, at *19.

24

ability, such a determination is a fact-intensive inquiry that generally requires a developed record.[96]

The Plaintiffs plead that the capital contributions required from Riverstone officers and directors to invest in Class B and Class C units of Invitation Homes—the "corporate opportunity"—total $5,495,100.[97] The Plaintiffs assert that "Riverstone was financially able to exploit the opportunity for itself," pointing exclusively to the fact that Riverstone's financial statements reveal that the Company had more than $72 million in assets and over $18 million in current assets at the end of 2012.[98] According to the Defendants, however, Riverstone's assets barely covered its liabilities: as of December 31, 2012, Riverstone's liabilities totaled over $71 million, and it had negative working capital of $30 million.[99] In addition, the Defendants point to other portions of the Company's financial statements to illustrate Riverstone's supposed financial distress.[100]

---

[96] *See generally Gen. Video Corp.*, 2008 WL 5247120 (financial ability determined post-trial); *Balin*, 1996 WL 684377 (same); *see also Broz*, 673 A.2d 148 (considering an appeal of a lower court's post-trial determination); *Yiannatsis*, 653 A.2d 275 (same).

[97] Compl. ¶ 47. The Plaintiffs plead that the total includes deferred capital contributions for Class A units. *Id.* I note that the total amount paid by the Director Defendants appears to be closer to $4.65 million. *See supra* note 52.

[98] Compl. ¶ 47; *see also* Defs' Opening Br., Ex. 1 ("2012 Financial Statements"), at 3. While the 2012 Financial Statements were not attached to the Plaintiffs' Complaint, the Plaintiffs refer to the financial statements in their pleadings. The 2012 Financial Statements are integral to the Complaint and I therefore find it appropriate to consider them as part of my analysis of the motions here. *See Orman v. Cullman*, 794 A.2d 5, 15 (Del. Ch. 2002).

[99] 2012 Financial Statements, at 3.

[100] In its 2012 Financial Statements, Riverstone discloses that "CAS Capital has represented to the Company that, if necessary, it has the ability and intent to provide financial support." *Id.* at 9. In its section regarding related-party transactions, moreover, Riverstone discloses that it has recorded

25

The issue presented, at this (hypothetical) motion to dismiss stage, is whether the Complaint pleads facts making it reasonably conceivable that Riverstone was financially able to pursue an approximate $5 million dollar opportunity. While Riverstone's financial statements may indicate that the Company was facing financial challenges, I conclude that it was reasonably conceivable that Riverstone was financially capable of investing in Invitation Homes and B2R, sufficient for a complaint to have withstood a motion to dismiss.

### b. Opportunity in the Corporation's Line of Business

The second requirement in a claim for usurpation of corporate opportunities is that the alleged opportunity must be in the corporation's line of business. The phrase "line of business," is not bound by a precise formula.[101] The court's inquiry is flexible and should be applied "reasonably and sensibly to the facts and circumstances of the particular case."[102]

The Delaware Supreme Court described a corporation's line of business as follows:

> Where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable

---

a liability of nearly $20 million payable to CAS Capital, which liability is "primarily composed of cash advances to fund operating shortfalls and other miscellaneous payments made on behalf of the Company." *Id.* at 28.

[101] *Guth v. Loft, Inc.*, 5 A.2d 503, 514 (Del. 1939).

[102] *Id.*

26

needs and aspirations for expansion, it may be properly said that the opportunity is in the line of the corporation's business.[103]

Accordingly, the nature of the corporation's business should be interpreted broadly, giving latitude to the corporation for development and expansion.[104] This liberal analysis, to my mind, is in line with the nature of the inquiry, which involves director loyalty to the entity she serves as fiduciary.

The opportunities in question here are investments in Invitation Homes and B2R, which are funds that invest in residential real estate and mortgages, respectively. According to the Defendants, Riverstone never was, nor did it plan to enter, the business of *investing* in real estate or in funds that invest in real estate. Instead, the Defendants argue that Riverstone was and continues to be a "fee-based property *management* company."

The Plaintiffs assert that the Defendants ignore its pleadings that allege the investment opportunities were conceived, developed, financed, and operated by Riverstone. They argue that Riverstone has a history of purchasing real estate companies,[105] and that it is reasonable to infer that Riverstone sought to expand its core fee-based multi-family management business into the single-family home

---

[103] *Id.*

[104] *See Dweck v. Nasser*, 2012 WL 161590, at *13 (Del. Ch. Jan. 18, 2012) (citing *Guth*, 5 A.2d at 514).

[105] I note that the Defendants argue that the entirety of Riverstone's previous acquisitions were in either the multi-family management business, or other related service businesses, all of which are in Riverstone's traditional core line of business. *See* Defs' Reply Br. 17–18.

27

investment market. The Plaintiffs allege that the investment idea was devised by Riverstone. Following the 2008 financial crises, "Riverstone saw an opportunity to profit from the single-family property market while prices were depressed by purchasing, rehabilitating, and leasing homes and, thereafter managing the leases."[106] The Company therefore hired an independent contractor to study the financial feasibility of implementing that vision,[107] and hired Jefferies to help it locate institutional investors.[108] According to the Plaintiffs' pleadings, the Company "envisioned Riverstone, either directly or through its subsidiaries, functioning as both a limited partner of the proposed fund, entitled to receive preferred returns, and as the general partner of the fund, with management responsibilities and the right to receive promoted or carried interest."[109] Together with Treehouse, it then devised a fund, Treehouse Residential, that was promoted as "a national platform with the proven ability to acquire, renovate, lease, and manage single-family rental homes to an institutional standard."[110] Eventually, after Riverstone had developed the business model and devoted to that model its personnel and infrastructure, Blackstone took over the business by creating Invitation Homes.[111] In sum, the Plaintiffs assert that Riverstone expended "tremendous energy establishing

---

[106] Compl. ¶ 21.
[107] *Id.* at ¶ 22.
[108] *Id.* at ¶ 23.
[109] *Id.*
[110] *Id.* at ¶ 25.
[111] *Id.* at ¶¶ 27–28.

Invitation Homes," providing "employees, resources, and funds" to "develop, advance, and execute the Invitation Homes business plan and business model."[112]

Based on the facts as alleged in the Complaint, it is reasonably conceivable that Riverstone sought to expand its traditional line of business into the market for investing in single-family homes. I recognize that the Complaint is scant of facts that indicate Riverstone had actually invested in that market in the past, nor do the allegations indicate that Riverstone made a formal declaration that it planned to enter the investment business. I also acknowledge that it is reasonably conceivable that Riverstone—consistent with a "management only" business model—acted to establish Invitation Homes to increase its *management* business, eschewing an ownership role. Assuming the truthfulness of the facts as alleged, however, it is reasonably conceivable to infer that Riverstone expended significant resources in developing the business model with an expectation that it would expand its business into ownership; in other words, that investment in home ownership was within Riverstone's line of business.

### c. Interest or Expectancy in the Opportunity

The third requirement is that the corporation had an interest or expectancy in the opportunity. "[F]or the corporation to have an actual or expectant interest in any specific property, there must be some tie between that property and the nature of the

---

[112] *Id.* at ¶ 46.

corporate business."[113]    In *Broz v. Cellular Information Systems, Inc.*,[114] the Delaware Supreme Court found that the company had no interest or expectancy in the opportunity at issue.    In so finding, the Court examined the company's "articulated business plans" as well as trial testimony that it found indicated the alleged opportunity "would not have been of interest" to the company.[115]

The Defendants argue that Riverstone consistently articulated a business plan limited to acting as a property manager, which did not include investment activities. They point to various presentations made to investors and lenders by Treehouse/Invitation Homes that contemplate that Riverstone would act as a property manager.[116]    On the other hand, the Plaintiffs point to a different presentation, one that was given in the earliest stages of the facts at issue, in which Jefferies presented a representative structure that envisioned Riverstone participating in an ownership capacity.    The Plaintiffs also argue that the fact that Riverstone contemplated acting as property manager to Invitation Homes—as expressed in the presentations cited by the Defendants—does not preclude Riverstone from also pursuing other interests in the business.

Based on the pleadings cited in my analysis of the second (line of business)

---

[113] *Broz*, 673 A.2d at 156 (quoting *Johnston v. Green*, 121 A.2d 919, 924 (Del. 1956)).
[114] 673 A.2d 148 (Del. 1996).
[115] *Id.* at 156.
[116] I note that that the presentations were attached to the Defendants' opening brief but were not included in the Complaint.

element discussed above, I find it reasonably conceivable that Riverstone had an interest or expectancy in an investment in Invitation Homes and B2R. That is, it is not beyond reasonable conceivability that, based on the facts as alleged, Riverstone devoted significant time and resources to the development of a business model with the expectation that it would obtain an ownership interest therein, and not merely for the purpose of attaining a servicing role.

I note that the Defendants point to this Court's findings in *Balin v. Amerimar Realty Co.*,[117] in which the Court found that a real estate services company had no expectation in an investment of real property.[118] While the Defendants are quick to identify many similarities between the facts in *Balin* and the facts at issue here, I find it important to note the procedural posture of that case. *Balin* was decided following a trial in which the Court benefited from live testimony, exhibit evidence, and post-trial briefing. On a motion to dismiss, where the Plaintiffs' allegations are taken as true, it would not be appropriate to weigh the conflicting evidence pointed to by the parties, and the benefit of the dispute would go to the Plaintiffs.

### d. Inimicable Positions

The fourth and final requirement in a claim for usurpation of corporate opportunities is that by taking the opportunity for their own, the corporate fiduciaries

---

[117] 1996 WL 684377 (Del. Ch. Nov. 15, 1996).
[118] *Id.*

were thereby placed in a position in conflict to their duties to the corporation. In *Broz,* the Court found that "[t]he corporate opportunity doctrine is implicated only in cases where the fiduciary's seizure of an opportunity results in a conflict between the fiduciary's duties to the corporation and the self-interest of the director as actualized by the exploitation of the opportunity."[119]

The Defendants argue that the Complaint fails to show that the Defendants' investments in Invitation Homes and B2R were inconsistent with their duties to Riverstone. They proceed to clarify the structure of the entities owned by the Goulds in relation to Invitation Homes. According to the Defendants, Invitation Homes arose as a partnership between Treehouse and the Regis Group, and not Riverstone. The Goulds, who owned the Regis Group and indirectly controlled Riverstone, were in the business of investing in real estate. Riverstone, on the other hand, was merely a related entity selected to be the property manager. In other words, the investments at issue correspond with the overarching structure of the Gould's various business interests, in which certain entities invest in real estate, while others, such as Riverstone, merely service real estate. An investment by the former, therefore, cannot be inimical to the interests of the latter.

The Plaintiffs argue, to the contrary, that by taking the opportunities for themselves, certain Defendants were placed in a position conflicting with their duties

---

[119] *Broz,* 673 A.2d at 157.

to the Company. They argue that the "Defendants made liberal use of Riverstone's resources in developing and advancing the Invitation Homes and B2R opportunities, but seek to claim all the benefits—including the promote interest in Invitation Homes—for themselves."[120] Moreover, the Plaintiffs assert that the Defendants' inimical position is confirmed by the fact that the board found it necessary to waive any actual or potential conflicts of interest caused by their individual investments in Invitation Homes.[121]

The fourth and final element, in the circumstances here, is inextricably intertwined with the elements that precede it. I find that the Defendants' argument that a "no-ownership" role for Riverstone is consonant with the Gould's "overarching structure" is irrelevant, at best; the directors' loyalty runs to Riverstone and its stockholders, not the interest of the controller. If the Plaintiffs can show that Riverstone was financially able to invest in Invitation Homes, that such an investment was part of the Company's plans to enter a new market, and that the Company expected to obtain an ownership interest in the ultimate business model

---

[120] Pls' Answering Br. at 37.

[121] I note that the Defendants have offered a significantly different, and plausible, account of the board vote. According to the Defendants, the board met in 2012 to approve the property-management agreement between Invitation Homes and Riverstone. Defs' Reply Br. at 21. Recognizing that certain Riverstone directors *already* had direct financial interests in Invitation Homes, the board waived any potential conflicts in order to approve the property-management agreement. *Id.* Therefore, the potential conflict, according to the Defendants, was not in the actual investment in Invitation Homes, but arose when Riverstone sought to enter a property-management agreement with Invitation Homes, a company in which the Directors had already invested.

(*i.e.*, Invitation Homes and B2R), then it is reasonably conceivable that certain Director Defendants, by directing the investments away from Riverstone and towards themselves, are now in a position hostile to the interests of the Company to which they are fiduciaries. That is, it is reasonably conceivable that, due to the actions of its fiduciaries, the Company has missed a valuable opportunity.[122]

* * * * *

For the foregoing reasons, I conclude that it is reasonably conceivable, based on the pleadings, that the Defendants usurped corporate opportunities that belonged to Riverstone. Therefore, a viable cause of action against the Defendant directors existed at the time of the Merger, and was a corporate asset.

### 2. The Director Defendants were aware of the potential that they were liable for the Usurpation Claims at the time of the Merger.

Here, the Company's directors were aware of an investigation regarding specific allegations that could evolve into personal liability. On May 20, 2014, ten days before the Merger Agreement was executed, counsel for Plaintiffs notified Riverstone of the Plaintiffs' claims that Riverstone directors and officers breached their fiduciary duties by usurping the opportunity to invest in Invitation Homes. The Plaintiffs demanded that they be allowed to inspect Riverstone's books and records,

---

[122] Defendants point out that the Complaint does not plead that the Defendants' investments precluded Riverstone from also investing. Such an assertion is unnecessary here, since, at least with respect to the interests that *Defendants* acquired, Riverstone was so precluded.

34

including documentation related to B2R. After their request was rejected, the Plaintiffs sent an additional books and records demand letter on May 29, 2014, this time requesting records regarding the classification of the Contributions. Finally, on May 30, 2014, the day the Merger Agreement was executed, the Plaintiffs filed suit under Section 220 of the DGCL, seeking an order compelling the Company to provide them with certain books and records. Shortly after the Merger Board was notified of the Plaintiffs' investigation, the Merger Board executed the Merger Agreement, dated May 30, 2014, that purportedly released all potential liability concerning the Usurpation Claims that may have followed from that investigation.[123]

I conclude, in light of these facts, that the Defendant Directors were aware of the existence of the Usurpation Claims and of the likelihood that these claims would be brought derivatively at the time the Company negotiated the Merger.

### 3. The Complaint sufficiently alleges that the potential Usurpation Claim liability was material to Nicholas Gould, Peter Gould, and Michael Pearson.

According to the Complaint, the value of the Derivative Claims exceed "hundreds of millions of dollars."[124] The Plaintiffs reach this value based on optimistic inference. First, they allege that "modeling of the potential value by

---

[123] In their answering brief, the Plaintiffs assert that a "Mutual Release" was included as Exhibit E to the Merger Agreement. Pls' Answering Br. 40. Neither the Merger Agreement nor the "Mutual Release" were attached to the Complaint. I thus rely on the Plaintiffs' characterization of the release of liability as alleged in the Complaint.

[124] Compl. ¶ 60.

Jefferies in the first quarter of 2012 suggests that the interests in Invitation Homes usurped by certain Riverstone officers and directors were worth hundreds of millions of dollars to more than $1 billion."[125] Second, the Plaintiffs allege that Riverstone officers and directors were offered approximately 70% of the "promoted," or carried interest in Invitation Homes.[126] In light of Invitation Homes' portfolio, allegedly worth more than $7.5 billion, "the claims against Riverstone's officers and directors were easily worth hundreds of millions of dollars."[127]

The Defendants argue that the Plaintiffs' "fantastic allegations" regarding the value of the derivative claims are "without any grounding whatsoever."[128] To the extent the Plaintiffs rely on an alleged early-stage model created by Jefferies, the Defendants explain, that model would have valued an entity with a structure that is far different from the structure actually implemented by Blackstone in Invitation Homes. Jefferies' early model, therefore, does not accurately represent the "promote interests" offered to Riverstone's officers and directors.

The Plaintiffs' factual support for their alleged valuation in its Complaint is far from replete, and I approach their Brobdingnagian assertions of materiality with skepticism. Moreover, I recognize that the Defendants have rightly identified

---

[125] *Id.* at ¶ 48.
[126] *Id.* at ¶ 42.
[127] Pls' Answering Br. at 39.
[128] Defs' Reply Br. at 24.

reasons to discount the validity of Jefferies' early valuation model. Nonetheless, the Plaintiffs have alleged that certain Director Defendants were required to make investments funded, in part, by the following deferred capital contributions: $1,900,000 from Nicholas Gould; $2,600,000 from Peter Gould; and $150,000 from Michael Pearson.[129] I can assume, for the purposes of the motions here, that the value of the usurped opportunity approximates or exceeds these investments, which total $4.65 million.[130] Based on those values, and the Plaintiffs' allegations as to damages, I conclude that the Plaintiffs have sufficiently pled particularized facts sufficient to find that the potential liability of the Usurpation Claims was material to Pearson and the Goulds.[131]

### 4. The Usurpation Claims were extinguished in the Merger.

Shortly after the Merger Board was notified of the Plaintiffs' investigation,

---

[129] *See supra* note 52.

[130] Of course, the extent of potential damages would be *net* of investment costs. I point to this figure simply to indicate that the size of the venture makes its materiality reasonably conceivable.

[131] For the first time at oral argument, the Defendants asserted that the Plaintiffs' actions (or inactions) in association with a bid for the Company imply that the derivative claims were not as valuable as the Plaintiffs allege here; in fact, that they were not material at all. Oral Arg. Tr. 25–26. According to the Defendants, the Plaintiffs were part-owners of a joint venture that submitted an indication of interest to purchase Riverstone. The joint venture was outbid by Greystar, who purchased the Company for $94 million. It follows, according to the Defendants, that the derivative claims cannot be worth hundreds of millions of dollars or else the Plaintiffs would have been eager to increase their bid to secure the valuable derivative claims. Other than a broad reference to "various indications of interest," however, the Complaint does not refer to the Plaintiffs' specific indication of interest, which is not integral to their allegations. The Defendants, moreover, did not raise the argument in their briefing. I therefore decline to consider the Defendants' argument concerning the Plaintiffs' foregone bid for Riverstone at this stage of the litigation. I note, however, that it may prove significant at later stages of the litigation.

the Merger Board executed the Merger Agreement, dated May 30, 2014, that purportedly released all potential liability concerning the Usurpation Claims that may have followed from that investigation.[132] Thus the terms of the Merger Agreement render the buyer incapable of pursuing such a claim.

> 5. <u>The pleadings are sufficient to demonstrate, at the motion to dismiss stage, that the majority of the Merger Board was interested in the Merger.</u>

For the reasons above, the Plaintiffs have pled with particularity that, at least, Pearson and the Goulds were aware that they faced a derivative claim at the time they were considering the Merger, that the claim was viable, and that potential liability was material to them. They approved a merger which precluded prosecution of those claims derivatively, as a matter of law, and precluded the acquirer's pursuit of the claims as a matter of contract. They thus secured a valuable benefit from the Merger not shared by the stockholders. In light of this self-interest, their duty of loyalty is implicated, and the presumption of the exercise of business judgment overcome.

### B. *It is Reasonably Conceivable that the Merger was Not Entirely Fair*

Once a plaintiff rebuts the business judgment rule, the burden shifts to the defendant to establish that the merger was the product of both fair dealing and fair

---

[132] *See supra* note 123.

price.[133]  The applicability of the entire fairness standard "normally will preclude a dismissal of a complaint on a Rule 12(b)(6) motion to dismiss."[134]  However, "[e]ven in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair."[135]

The Plaintiffs allege that the merger price was unfair because it did not include value for the foregone derivative claims, which, the Plaintiffs allege, were material in light of the size of the Merger.  The Defendants disagree that any potential claims were material.  I have already discussed the materiality of the Usurpation Claims to the Director Defendants in connection with my analysis of the standard of review. The investment made by the Defendant Directors totaled approximately $4.65 million.  Assuming, as I did above, that the investments made by the Defendants provide some indicia of the value of the Usurpation Claims,[136] the usurped investments represent approximately 5% of the gross merger consideration, and approximately 10% of the merger consideration net of post-closing adjustments.  I find that it is reasonably conceivable, in light of the relatively modest merger

---

[133] *Calma ex rel. Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 589 (Del. Ch.2015) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

[134] *Id.* (quoting *Orman*, 794 A.2d at 20 n.36).

[135] *Id.* (quoting *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996)).

[136] Again, I acknowledge that the value of the chose-in-action would be the value of the litigation asset *net* of investment.

consideration, that the Usurpation Claims are material in the context of the Merger. Thus, it is reasonably conceivable that the Merger was not entirely fair.

* * * * *

I conclude, therefore, that the Plaintiffs have adequately pled facts indicating that entire fairness applies *and* that the transaction was not entirely fair, sufficient to withstand the Defendants' Motions to Dismiss.

### C. The Other Director Defendants and CAS Capital

While the Plaintiffs have sufficiently pled that three of the five Director Defendants lacked independence—sufficient to invoke entire fairness review—the other two Director Defendants, Danner and Wanich,[137] are also named as Defendants, as is the controller, CAS Capital. I do not address whether the Complaint states a claim against those Defendants in this Memorandum Opinion. That is because the Defendants did not seek to dismiss them in their motions or opening brief, outside of the context of the standing arguments and the determination of the standard of review addressed above. In their *reply brief*, I note, the Defendants devote a separate section to Danner and Wanich. They argue that, regardless of the standard of review, Danner and Wanich acted independently and, in light of the

---

[137] In their Complaint, the Plaintiffs argue that Danner and Wanich were unable to act independently because, as officers of Riverstone, they were dependent upon the Goulds, who own and control the Company's majority stockholder, for their livelihoods. Compl. ¶ 61.

40

Company's exculpation clause, they should be dismissed.[138]  The Defendants' argument, however, is untimely, and I therefore do not consider it here.  Nothing in this opinion should prevent the Defendants from seeking summary judgment in their favor, as appropriate.

### D. Riverstone as a Defendant

In their Complaint, the Plaintiffs allege that Riverstone is "named as a necessary party and to ensure the Court's ability to grant complete relief to Plaintiffs."[139]  In their opening brief, the Defendants assert that there is no reasonably conceivable basis for including Riverstone in the fiduciary portion of this action. They argue that Riverstone is not named in any of the specific counts of the Complaint and that the entity itself did not owe stockholders any fiduciary duty.

In their answering brief, the Plaintiffs respond by arguing that Riverstone "as an entity is integral to this case" although concede that they "have not sought to improperly shift liability onto Riverstone."  The Plaintiffs assert that they would like to take discovery from Riverstone, and that dismissal invites "complexity and formality where [it is] unnecessary to the fair and efficient procession of

---

[138] *See In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179 (Del. 2015) ("[P]laintiffs must plead a non-exculpated claim for breach of fiduciary duty against an independent director protected by an exculpatory charter provision, or that director will be entitled to be dismissed from the suit. That rule applies regardless of the underlying standard of review for the transaction.").

[139] Compl. ¶ 11.

41

litigation."[140]

Under Delaware law, fiduciary duties are owed by the directors and officers of a corporation and not by the corporation itself.[141] Therefore, Riverstone cannot be held liable for any of the claims pled by the Plaintiffs based in breach of fiduciary duty. I also note that, despite their contentions in the briefing, the Plaintiffs failed to address their theory against Riverstone at oral argument. The claims asserted against Riverstone for breach of fiduciary duty, to the extent they exist, are accordingly dismissed.

*E. The Misclassification Claim*

In their Complaint, the Plaintiffs challenge the classification of the Contributions made by CAS Capital and/or its affiliate, Regis, pre-merger. While the bulk of the Complaint is devoted to the alleged usurpation of corporate opportunities, only three paragraphs are used to describe the allegedly misclassified contributions.[142] According to the Complaint, CAS Capital and Regis made contributions to Riverstone pre-merger. As of the date of the Merger, those

---

[140] The Plaintiffs quote then-Vice Chancellor Strine's decision in *Nagy v. Bistricer*, 770 A.2d 43, 56 (Del. 2000). In *Nagy*, the Court determined that appraisal and fiduciary duty claims do not have to be brought in separate actions. In making that determination, the Court noted that in that particular case, "it would disserve judicial and litigative efficiency to require separate complaints." *Id.* at 58. The Court did not conclude, however, that a plaintiff could continue to pursue a claim against a defendant that cannot be held liable—supposed judicial and plaintiff economy notwithstanding.

[141] *See Buttonwood Tree Value Partners, L.P. v. R.L Polk & Co., Inc.*, 2014 WL 3954987, at *4 (Del. Ch. Aug. 7, 2014) (citing *In re Wayport, Inc. Litig.*, 76 A.3d 296, 322–23 (Del. Ch. 2013)).

[142] Compl. ¶¶ 50–52.

42

contributions totaled $20,319,896 and were recorded on Riverstone's books as debts "due to affiliates"—a liability.[143] Per the Complaint, the base purchase price for the Merger was reduced by Riverstone's indebtedness, which included the contested Contributions, as part of a post-close adjustment.[144] In the words of the Plaintiff, "the Goulds were able to cause these amounts to be treated as unsecured debts due to their affiliates in the Merger," despite the fact that "there [was] no documentation that would indicate [the] 'loans' were approved by the board."[145] The Plaintiffs contend that the Contributions should have been classified as paid-in-capital—equity, rather than debt—and should not have reduced the merger consideration. It therefore follows, Plaintiffs argue, that "the Goulds, through CAS Capital and Regis, were able to increase the distributions they received from the Merger by ensuring that these amounts would be paid for their benefit before any distribution of merger consideration to Riverstone's minority stockholders."[146]

Despite those allegations, I find the Classification Claim incomprehensible as an attack on the fairness of the merger. The Plaintiffs fail to articulate how the "*merger terms* were tainted by unfair dealing."[147] The Complaint merely includes a conclusory allegation that the Goulds, through their affiliates, "caused" the

---

[143] Id. at ¶ 51.
[144] Id. at ¶ 58.
[145] Id.
[146] Id. at ¶ 52.
[147] *Golaine v. Edwards*, 1999 WL 1271882, at *7 (Del. Ch. Dec. 21, 1999) (emphasis added).

misclassification of the Contributions, to the detriment of minority stockholders. Absent from the Complaint are facts indicating when the alleged Contributions were made; and whether the accounting treatment changed between the times the Contributions were made and the time of the Merger, or whether the change was made in light of the Merger. Without more, it is not reasonably conceivable that the Defendants misclassified the contributions *as part of the merger*, thereby breaching their fiduciary duties.

Also missing from the Complaint is a plausible explanation of the harm suffered by minority stockholders as a result of the alleged misclassification. At the time of the Merger, CAS Capital was the Company's majority stockholder, owning over 90% of Riverstone's stock. If the Plaintiffs' are correct—that CAS Capital's $20 million contribution should have been classified as equity—CAS Capital would have received stock, or some other form of equity. Considering the comparative value of the contribution ($20 million) to the value of the Company implied in the Merger ($94 million), CAS Capital's ownership interest would have likely increased substantially, thereby diluting the Plaintiffs' interest. It is unclear, based on the facts alleged, that the Plaintiffs' share of the additional $20 million in merger consideration would have outweighed the dilution of the Plaintiffs' interest. Moreover, to the extent the misclassification harmed stockholders, greater than 90% of that harm fell on CAS Capital.

44

Having failed to challenge the *terms of the merger*, or plausibly allege resulting unfair price, the Plaintiffs' misclassification claim is dismissed. I note that the Plaintiffs' recovery for any wrongful misclassification is not forfeit, however. Having already found above that a majority of the Merger Board was interested in the Merger, the Defendants will bear the burden of showing that the Merger was entirely fair. Presumably, couched within that determination will be the value of the Company's assets and liabilities, the latter of which may require consideration of the classification of the challenged Contributions.

## III. CONCLUSION

Based on the foregoing, the Plaintiffs' claim that the Merger was unfair based on the Defendants' breach of fiduciary duty survives the motions to dismiss. All of the fiduciary claims related to the failure to obtain value for the Classification Claim, however, are dismissed. The Plaintiffs' claims based in fiduciary duty asserted against Defendant Riverstone National, Inc. are also dismissed. The parties should provide a form of order consistent with this decision.